BARBARA LEGGETT, Plaintiff-Appellee, v. VIJAY S. KUMAR, Defendant-Appellant.

Second District No. 2—90—0734

Opinion filed April 24, 1991.

258

David J. Cahill, of Wildman, Harrold, Allen & Dixon, of Wheaton, and Ruth E. VanDemark and Mary Elisabeth Ruether, both of Wildman, Harrold, Allen & Dixon, of Chicago (Robert A. Strelecky, of counsel), for appellant.

R. Gary Gooding, of Gooding & Goblet, and Wilson Burnell, both of Aurora (Meg E. Goblet, of counsel), for appellee.

PRESIDING JUSTICE REINHARD delivered the opinion of the court:

Plaintiff, Barbara Leggett, brought the instant medical malpractice action in the circuit court of Kane County against defendant, Dr. Vijay S. Kumar, alleging various acts of negligence arising out of defendant's performance of a bilateral subcutaneous mastectomy on plaintiff on June 23, 1981. The jury returned a verdict in plaintiff's favor for $675,000, and defendant now appeals.

The following issues are presented on appeal: (1) whether the trial court improperly reversed a pretrial order entered previously in the case by another judge; (2) whether defendant was prejudiced by the cumulative effect of the admission of improper evidence; (3) whether plaintiff's expert witness was improperly allowed to testify regarding previously undisclosed medical books and articles; (4) whether plaintiff's attorney engaged in improper final argument; (5) whether the trial court acted as an advocate for plaintiff in suggesting foundational questions; and (6) whether the jury's verdict was excessive and the result of passion or prejudice.

In May 1978, plaintiff began seeing Dr. John Landes, a general surgeon at the Dreyer Clinic, regarding cysts which had developed in her breasts in the late 1970s. Dr. Landes diagnosed plaintiff as having fibrocystic disease, which is a nonmalignant abnormality in the breast resulting in the formation of fluid-filled cysts. Eventually, on May 11, 1981, Dr. Landes, who was concerned that the disease could mask malignancies, recommended that plaintiff see defendant regarding a subcutaneous mastectomy with a prosthetic implant to address plaintiff's fibrocystic disease.

Plaintiff first became a patient of defendant's on May 21, 1981. On June 23, 1981, defendant performed a bilateral subcutaneous mastectomy and a silastic gel implantation on plaintiff's breasts with Dr. Landes assisting. In performing a subcutaneous mastectomy, a surgeon makes a hairline cut through the skin, tissue and muscle to remove breast tissue, which is then replaced by a prosthetic implant. A

small portion of breast tissue remains, and the outer skin, including the nipple, also remains.

Immediately after the surgery, plaintiff's breasts were connected to tubes to allow drainage of blood. Plaintiff was released from the hospital on June 28, 1981. On July 3, 1981, plaintiff noticed that her right breast was engorged. She was admitted to the hospital that evening and defendant again operated on both breasts. Defendant removed, cleaned and then reinserted both breast implants.

On July 13, 1981, plaintiff noticed the prosthetic insert coming out of the wound in the left breast. She went to defendant's office, where he removed the implant and bandaged the open wound. Plaintiff then visited defendant daily to have the wound checked. On July 16, 1981, defendant noticed that tissue in the left breast was necrotic (dying from lack of blood), so he surgically removed the necrotic tissue from around the sutures. The remaining sutures were removed from the left breast the next day. On July 27, 1981, defendant noticed that plaintiff's right nipple was separating from the breast. He advised plaintiff that the nipple would fall off but that a new one could be constructed out of tissue from plaintiff's groin.

On September 8, 1981, defendant closed the incision in plaintiff's left breast, which had been emitting some discharge up to that point. Plaintiff then returned to work for about 25 hours per week. Plaintiff was admitted to the hospital on October 8, 1981, for two days to have scar tissue removed from the left breast. On December 12, 1981, defendant surgically closed a small opening in plaintiff's left breast. The sutures were removed in defendant's office on December 22. Minor surgery was again performed on March 3, 1982, in defendant's office, at which time tissue was cleaned and a stitch placed in plaintiff's wound. The stitch was removed on April 6, 1982.

Plaintiff was again admitted to the hospital on June 18, 1982, for surgical reinsertion of the prosthetic implant in her left breast. Plaintiff was released from the hospital on June 22, 1982. A few days later, however, plaintiff again noticed the prosthesis coming out of the wound in her breast. Plaintiff saw defendant again on August 27, 1982, and discussed various surgical alternatives. Plaintiff next saw defendant on November 5, 1982, when he removed a small nodule from her left breast. Plaintiff subsequently sought treatment from a different doctor, Dr. Richard Schultz, on the advice of her attorney.

Plaintiff filed her first action against defendant and Dr. Landes in 1984 (No. 84—L—571) and voluntarily dismissed that action on September 25, 1986.

The instant action was filed on September 25, 1987, naming Dr. Kumar as the sole defendant. Plaintiff's complaint alleged that the silastic implant became infected and the breast became diseased, necessitating subsequent surgeries. Plaintiff alleged that defendant breached his duty to exercise ordinary care commensurate with the standard of care for plastic surgeons in the Chicago metropolitan area. Among plaintiff's specific allegations were that defendant advised the insertion of the implant when this procedure was contraindicated; failed to properly insert the implant; failed to advise plaintiff that a bilateral subcutaneous mastectomy was not essential and carried risks; and failed to advise plaintiff of treatment alternatives. With regard to post-surgical care, plaintiff alleged that defendant failed to care properly for the incision and the drains in the incision and attempted to surgically repair the incision when it was necrotic, inflamed and diseased.

On January 11, 1988, the trial court entered an order requiring that nonexpert discovery be completed by March 30, 1988, and that all depositions of expert witnesses be completed by July 30, 1988. A pretrial status hearing was set for April 4, 1988, and a pretrial conference pursuant to Supreme Court Rule 218 (134 Ill. 2d R. 218) was set for August 12, 1988. Trial was set to begin August 26, 1988. The deadline for discovery was later extended to November 15, 1988, and trial set for December 16, 1988.

On November 30, 1988, defendant filed a motion seeking to bar Dr. Richard Schultz from testifying as an expert for plaintiff. Defendant's motion noted that plaintiff's October 26, 1988, response to defendant's supplemental interrogatories regarding the identity of expert witnesses provided the first indication that plaintiff intended to utilize Dr. Schultz as an expert witness. According to defendant, plaintiff had still not responded to interrogatories regarding the substance and scope of Dr. Schultz's expert testimony. Noting that trial was less than 60 days away, defendant sought to exclude Dr. Schultz's expert testimony pursuant to Supreme Court Rule 220 (134 Ill. 2d R. 220).

Defendant also filed a separate motion regarding the payment of Dr. Schultz's anticipated deposition fee. The motion recited that Dr. Schultz had requested that he be paid a fee of $2,500 for the first hour of his deposition time and $2,000 for each hour thereafter. Defendant argued that such a fee request was patently unreasonable and designed to frustrate discovery. Defendant argued that, if Dr. Schultz were allowed to testify as an expert witness, then plaintiff should bear the cost of his fee pursuant to Supreme Court Rule 220

(134 Ill. 2d R. 220). Alternatively, defendant argued that, if Dr. Schultz were to testify as a treating physician only, then the court should order Dr. Schultz to submit to a discovery deposition for a reasonable fee pursuant to Supreme Court Rules 201(c) and 204 (134 Ill. 2d Rules 201(c), 204).

On November 10, 1988, Judge Patrick J. Dixon ruled on defendant's motion to exclude Dr. Schultz's testimony. The court's order stated, in pertinent part:

"Plaintiff shall be allowed to utilize Dr. Schultz as a witness/ treating physician but not as an expert on the issue of the alleged negligence of defendant Dr. Kumar."

Defendant was also "granted leave to subpoena the discovery deposition of Richard Schultz, M.D." No ruling was made regarding Dr. Schultz's deposition fee. The record contains no report of proceedings corresponding to the hearing on defendant's motion.

On November 16, 1988, plaintiff was granted leave to file her first amended complaint, which was filed of record on November 17. Among the additional allegations of negligence in the first amended complaint were that defendant failed to recognize or diagnose the condition of infection within the surgical site following surgery and failed to treat the infection properly.

On January 12, 1989, plaintiff filed a motion to reschedule the trial date, which had been set for April 7, 1989. On this date plaintiff also filed a disclosure of expert witnesses, naming, *inter alia*, Dr. Joseph Bocchino, Dr. Roger Hatcher, and Dr. Schultz as potential expert witnesses.

On January 25, 1989, defendant filed a motion to limit plaintiff's use of expert witnesses. The motion sought to exclude plaintiff's use of Dr. Bocchino and Dr. Hatcher because they had not been disclosed until January 11, 1989. Defendant further sought to limit Dr. Schultz's testimony to that of a treating physician only and not an expert in conformity with Judge Dixon's earlier order of November 10, 1988.

On February 16, 1989, Judge Michael J. Colwell, to whom the case was now assigned, issued the following order:

"This cause coming on for hearing on defendant's motion to bar plaintiff's experts: Dr. Bochino [*sic*], Dr. Hatcher, and Dr. Schultz, the court being advised that plaintiff has withdrawn Dr. Bochino [*sic*] and Dr. Hatcher as expert witnesses;

It is hereby ordered [that] defendant is granted leave to subpoena the deposition of plaintiff's treating physician, Dr. Richard Schultz."

After several continuances, trial was set for March 9, 1990, and the trial court heard a number of pretrial motions on that date. First, plaintiff was granted leave to file her second amended complaint, which alleged, in addition to the prior allegations of negligence, that defendant improperly reinserted the implant in an infected surgical site and repeatedly attempted to achieve secondary closure of the skin flaps despite the presence of inflamed, necrotic tissue.

Next, defendant presented three motions *in limine*. The first motion is not pertinent here. Defendant's second motion *in limine* sought to limit the testimony of Dr. Schultz. Defendant noted that the order entered on November 10, 1988, by Judge Dixon stated that Dr. Schultz would be allowed to testify "as a witness/treating physician but not as an expert on the alleged negligence of defendant." Defendant indicated that he did not depose Dr. Schultz as a treating physician because Dr. Schultz requested that he be paid more than $2,000 per hour for his time. Defendant indicated, however, that he believed that plaintiff intended to utilize Dr. Schultz as an expert witness. Attached to defendant's motion was a letter from plaintiff's attorney dated February 28, 1990, regarding articles upon which Dr. Schultz would rely in his testimony.

Defendant asked that, in conformity with Judge Dixon's prior order, Dr. Schultz should not be allowed to give expert testimony regarding defendant's alleged professional negligence. Defendant argued that it would be unfair to allow plaintiff to utilize her treating physician as an expert regarding the quality of care given by plaintiff's prior doctor without disclosing his opinions and without paying the cost of deposing the witness. Plaintiff's attorney responded by noting that, at the time of Judge Dixon's November 10, 1988, order, trial was set for the next month. Plaintiff argued that Dr. Schultz subsequently was timely disclosed as an expert on January 12, 1989, and that:

"Defense counsel then came in on a motion to bar any experts or expert testimony, which you then ruled upon on February 16, 1989, allowing us the use of Dr. Schultz's testimony as a treating physician with absolutely no limitation whatsoever. And advising counsel for defendant that if he wanted to know what Doctor Schultz had to say, that he could subpoena him for deposition at that point in time."

Defense counsel did not take issue with this characterization of the February 16, 1989, ruling.

Acknowledging that the issue was "a difficult area," Judge Colwell ruled that Dr. Schultz could testify as an expert, including testi-

mony based on plaintiff's prior medical treatment and on various medical books and articles.

Defendant's third motion *in limine* sought to limit the testimony of Dr. David Befeler, plaintiff's expert witness. The court delayed consideration of the motion.

Attorneys for the parties gave their opening statements on March 12, 1990. Plaintiff's counsel began by explaining the nature of the subcutaneous mastectomy. When the attorney described plaintiff's various post-operative complications, including the allegation that defendant placed the prosthesis into an infected area, defense counsel objected. At a sidebar, defense counsel contended that the statements were objectionable because plaintiff had no expert testimony pertaining to post-operative negligence. Plaintiff indicated that Dr. Schultz would provide such testimony. The court overruled the objection, and opening arguments proceeded.

Before moving to the presentation of evidence, the court heard several of defendant's objections to the evidence deposition of Dr. David Befeler, some of which were also the subject of defendant's prior motion *in limine*. Of interest here is defendant's request to exclude Dr. Befeler's reference to specific medical texts in support of his expert testimony. Defendant argued that these texts were not disclosed pursuant to his discovery requests and should therefore not be included in Dr. Befeler's testimony. The court delayed its consideration of this issue.

Plaintiff first called defendant as an adverse witness. During a break in defendant's testimony, defendant's attorney asked the court for a recess of less than an hour to allow him to conduct a discovery deposition of Dr. Schultz before he testified the next day. The court stated that it had already ruled on this issue and asked why the matter was being raised again. Defendant's attorney stated that, until the preceding Friday, he had relied on Judge Dixon's November 10, 1988, order limiting Dr. Schultz's testimony. The court expressed concern about the point in the proceedings at which the issue was presented and stated that it would take the matter under advisement.

Defendant testified that he discussed several surgical options with plaintiff and also informed her of the risks associated with the subcutaneous mastectomy, such as injection, bleeding and rejection of the prosthesis. During defendant's testimony, plaintiff's counsel asked him about infection, antibiotics, and the cleanliness of the implant. Defendant answered affirmatively when asked whether it was important to keep an office clean, but the court sustained defense counsel's objection when plaintiff's attorney asked who cleaned defendant's office.

Defendant acknowledged that, when he removed the implant from plaintiff in his office, he was not wearing surgical gloves. Defendant was also asked a number of times about the type of sutures he used.

Defendant testified that, at some point in plaintiff's post-operative treatment, he consulted with Dr. Chandra, a cancer specialist and blood-disorder physician. Plaintiff's attorney asked whether Dr. Chandra was consulted because plaintiff's wound was not healing and because of an infection problem, and defendant responded, "[t]he wound was not healing, yes." On redirect examination, plaintiff's attorney asked defendant whether Dr. Chandra was an infectious disease expert, and defendant's attorney objected. At a sidebar, defense counsel explained that he objected to the question because plaintiff would not present any expert testimony that defendant breached his duty of care by failing to consult with an infectious disease expert. The court agreed, and plaintiff's attorney withdrew the question. Defendant then moved for a mistrial, arguing that the damage had already been done. The court refused to grant a mistrial on the basis of plaintiff's improper question, but stated that it would do so "if there's any more." The court then instructed the jury to disregard the question, and defendant completed his testimony.

Plaintiff testified that defendant never physically examined her before the surgery and that he never informed her of the risks of, or alternatives to, surgery. Plaintiff testified that defendant did not tell her that the left breast would be operated on in the July 3, 1981, follow-up surgery. After this operation, plaintiff stated, defendant told her that there was hematoma in her right breast and that the left breast was infected. Plaintiff also testified that, when she first saw defendant in his office regarding the implant emerging from her wound, he indicated to her that it was infected. He removed it with his bare hands and bandaged her wound.

Plaintiff described how defendant, dressed in his street clothes, would clean her wound on visits to his office. Defense counsel then requested a sidebar wherein he asked the court to exclude testimony regarding the cleanliness of defendant's office because plaintiff would not be presenting any evidence to show that there was any infection caused by unsterile conditions at defendant's office. The court directed plaintiff's attorney to "stay away from the question of the cleanliness unless you're able to tie it up later with your experts."

Plaintiff testified that, when she was admitted to the hospital in June 1982 for reimplantation of the prosthesis in her left breast, defendant did not explain the risks and complications attendant to the surgery. Immediately after her surgery, plaintiff's left breast felt like

a "little knot" compared to the size of her right breast. Plaintiff testified that, after she again discovered the implant emerging from her wound on Friday, she visited defendant at his office the following Monday. At that time, she refused to allow defendant to again remove the implant in his office. Plaintiff testified that defendant never told her that cysts could recur after the mastectomy was performed. On plaintiff's last visit to defendant's office, he began to discuss future options, but she jumped down from the examining table and told him, "[y]ou will never cut me again."

Plaintiff testified that, in 1983, she underwent a surgical procedure performed by Dr. Schultz which involved relocating a flap of plaintiff's skin to the breast area. Plaintiff was asked whether she had undergone any further surgical procedures by Dr. Schultz:

"A. No, I have not.

Q. And why is that, Barbara?

MR. STRELECKY [defense counsel]: I'm going to object, Your Honor.

THE COURT: I think she can answer.

A. I just haven't had the money to have it done."

Plaintiff's testimony continued for a few moments, and then a sidebar was held on an unrelated issue. At the sidebar, defense counsel also revisited the subject of his prior objection. Defense counsel contended that plaintiff's statement about her inability to afford further surgery should be stricken to avoid any exploration of plaintiff's otherwise irrelevant financial condition. The trial court refused to strike the testimony.

During plaintiff's testimony, her medical bills totalling more than $40,000 were introduced into evidence, and plaintiff estimated her lost income at $1,800. The trial was recessed following plaintiff's testimony.

The proceedings resumed the next day with discussion of defendant's motion *in limine* to limit the scope of the evidence deposition of plaintiff's expert Dr. David Befeler. Defendant's motion *in limine* recited that, in response to defendant's interrogatories seeking disclosure of the opinions Dr. Befeler would give, plaintiff indicated that the information would "be determined from deposition testimony." Defendant's motion noted that, at the October 11, 1988, discovery deposition, Dr. Befeler indicated that he did not know of any specific articles appearing in the medical literature which would support his opinions. However, defendant claimed that, at Dr. Befeler's evidence deposition, the doctor did, in fact, make reference to medical journal

articles. Defendant asked the court to strike the use of medical authority on direct and redirect examination of Dr. Befeler.

The trial court ruled that Dr. Befeler "did mention the use of journals," so the reference to medical journals was not stricken. The court allowed the use of another article conditioned upon his review, and he struck one reference to another article.

Moving to the subject of Dr. Schultz's testimony, defense counsel then noted that the court had never ruled on defendant's request to take Dr. Schultz's deposition. Defense counsel indicated that a subpoena had been issued to Dr. Schultz, but no deposition had yet been taken. The court stated, "[y]ou can take your deposition, but I don't know when you're going to do it." Plaintiff's attorney objected, noting that the court granted defendant leave to subpoena Dr. Schultz's deposition on February 16, 1989, more than a year before. Plaintiff's attorney argued that, although defendant could have obtained a ruling from the court on the reasonableness of Dr. Schultz's deposition fee request, he failed to do so. The court then stated:

"THE COURT: I guess I had forgotten about the subpoena problem. And you *** never did it because you didn't want to pay the money, and didn't want to come into court and seek any relief from me.

MR. STRELECKY [defense counsel]: Your Honor, the reason we didn't want to pay the money is because we relied on the prior Court's orders which stated that this doctor—

THE COURT: Wait a minute. You have been mentioning this prior Court's order a lot. Let me tell you something very fundamental.

That is, a Trial Judge is not bound by some other Judge's order in a case.

Now, as far as I'm concerned, if we've got an order that is after that, that covers this problem, as far as I'm concerned, that's a dead horse and you ought to let it be buried, because the law's clear that I'm not bound by any order that was entered by some other Judge prior to trial.

So, let's bury that horse right now."

The court ruled that Dr. Schultz's testimony would proceed without allowing for a deposition.

The proceedings before the jury resumed with the reading of Dr. Befeler's evidence deposition. Dr. Befeler, a general surgeon practicing in the New Jersey area, described two approaches to the subcutaneous mastectomy: the submammary approach, where the incision is made underneath the breast, and the transverse approach, in which

an incision is made transversely across the middle of the breast and around the areolar nipple complex. Dr. Befeler testified that the transverse approach is the "procedure of choice" and that the submammary approach is not preferred "because it is associated with too high a degree of complications and too high a degree of retained breast tissue." Dr. Befeler explained that, although the submammary approach was once preferred because the incision was hidden, in the 1960s and 1970s it was recognized that the approach left too much tissue behind. This made it possible for cysts and cancerous growths to recur.

When asked what medical articles had been published on this subject matter, Dr. Befeler identified two books and indicated that various medical journals also occasionally carry articles dealing with mastectomy. Dr. Befeler testified that the standard of care for a surgeon in the Chicagoland area is the same as the standard of care in the rest of the nation. Dr. Befeler stated that, before a surgeon recommends a subcutaneous mastectomy for a patient with fibrocystic disease, he should recommend a conservative course of treatment, including caffeine avoidance and vitamin therapy. The subcutaneous mastectomy is indicated for extremely rare patients with fibrocystic disease.

Dr. Befeler's expert medical opinion was that plaintiff's symptoms were not sufficient to indicate bilateral subcutaneous mastectomy as the procedure of choice, regardless of the approach utilized. Further, Dr. Befeler opined that it would be a breach of a surgeon's duty of care not to inform a patient of the risks associated with such a procedure (infection, bleeding, scarring around the prosthesis or rejection of the prosthesis, loss of the nipple, and recurrent disease in the breast) and alternative treatments. Dr. Befeler testified that there were no deviations from the standard of care in defendant's actual performance of plaintiff's subcutaneous mastectomy. Based on viewing post-surgical photographs of plaintiff, Dr. Befeler was of the opinion that plaintiff suffered mental and physical pain as a result of her experience and that her appearance was so unsightly as to possibly require reconstructive surgery. Dr. Befeler believed that plaintiff's condition was the result of the "ill-advised, unindicated *** unnecessary surgery" performed by defendant "through an incorrect approach [which] led to a catastrophe."

Before Dr. Schultz testified for plaintiff, defendant renewed his motion *in limine* to limit Dr. Schultz's opinion testimony. The court responded that it would stand by its prior order.

Dr. Schultz testified that he engages in the general practice of plastic surgery, of which about 15% to 20% involves breast surgery. He estimated that he had treated approximately 25 patients with fibrocystic disease in his career. Defendant twice successfully objected to the lack of foundation for questions posed by plaintiff's attorney regarding conservative treatment of fibrocystic disease. When plaintiff asked a third question in this regard, defendant's attorney again objected, and the court directed the parties to proceed to his chambers.

In chambers, the court stated:

"THE COURT: The objection is as to foundation. You haven't asked any foundation questions. Now you're asking some kind of a hypothetical, which we don't want.

If you're going to use a hypothetical I've got to see it in advance, okay?

So, ask him some questions about what he notices about fibrocystic disease, and has he encountered it in his practice, then we can deal with it. But I think the objection is well-founded. Okay."

Plaintiff's attorney then asked, without objection, questions conforming to the foundational deficiency specified by the trial court. Soon thereafter, plaintiff's counsel elicited, over defendant's objection, Dr. Schultz's testimony regarding his criteria for proper treatment of fibrocystic disease, including the use of conservative therapy rather than mastectomy. Dr. Schultz was of the opinion that a reasonable practitioner would examine a patient before undertaking a surgical procedure such as a bilateral subcutaneous mastectomy.

As for his own treatment of plaintiff, Dr. Schultz testified that, when he examined plaintiff in 1982, her left breast exhibited scarring and an absence of profile, and her right breast exhibited a reconstruction with an implant which looked "quite good." Over defendant's objection, Dr. Schultz opined that plaintiff's physical condition and upset emotional state were related to the surgery performed by defendant. Dr. Schultz was also of the opinion that plaintiff's condition could result in permanent disfigurement and disability and that she suffers pain which he suspected was the result of her surgery. In Dr. Schultz's opinion, plaintiff would continue to suffer pain in the future.

Plaintiff's counsel asked Dr. Schultz whether, if infection were noticed following a subcutaneous mastectomy, it would be "good judgment" to wait six months before reimplanting a prosthesis once it had been removed. Defense counsel's objection to the question's vagueness and lack of foundation was sustained. Dr. Schultz stated that infection is one of the risks associated with subcutaneous mastectomy and, over

defendant's objection, testified that he avoids implantation of a foreign body into the infected tissues of his patients. When plaintiff's counsel asked Dr. Schultz if reimplantation of a prosthesis into infected tissue would constitute a deviation from the standard of care, defense counsel objected. The court sustained the objection and asked to see counsel in chambers.

In chambers, the court indicated that plaintiff's counsel could not ask questions unrelated to Dr. Schultz's own treatment of plaintiff without establishing that Dr. Schultz had reviewed the medical records pertaining to such treatment. The court told plaintiff's attorney:

> "THE COURT: *** "[Y]ou've got to establish this doctor knows something about that which you're asking him. I can't just pull it out of the sky from nowhere and say, you know: based on your treatment of your patient.
>
> He's here talking about his patient now. If he reviewed all of these records in the course of his treatment, he knows about the infection, and then you want to ask him about it, that's fine."

The court sustained defendant's objection, and the judge and the attorneys returned to the courtroom.

After Dr. Schultz testified that he reviewed plaintiff's hospital records which indicated the presence of an infection, plaintiff's attorney asked him whether it would be improper to place a prosthesis in the site of such an infection. Defense counsel objected, and the court stated:

> "THE COURT: Well, we're close. We need just a little bit more. So I'll sustain it with that admonition."

Plaintiff's attorney then asked several questions going toward foundation, but defense counsel's objections were sustained. The court again called the attorneys into his chambers, but the substance of what transpired there is not contained in the report of proceedings.

Dr. Schultz testified that he recommended a three-stage course of reconstructive surgery for plaintiff which would last about a year and cost approximately $21,500.

On cross-examination, Dr. Schultz testified that he had performed subcutaneous mastectomies on some of his own patients who then experienced complications such as the loss of a nipple or the loss or wrinkling of skin. Dr. Schultz agreed that such complications can arise even where the physician does not deviate from the expected standard of care.

Plaintiff's two daughters also testified. They described the manner in which plaintiff's emotional state declined following her surgery. During her testimony, plaintiff's daughter Lora said of her mother:

"She was real upset. We lived off our two paychecks, so we lost our house."

Defense counsel objected, and the court instructed the jury to disregard the remark.

Plaintiff's attorney rested but then asked the court to allow a life expectancy table to be read to the jury. Defense counsel objected based on the lack of evidence as to the permanence of plaintiff's injury. The trial court indicated that plaintiff could have the life expectancy table read to the jury.

Defense counsel then asked the court to declare a mistrial. He argued that plaintiff's evidence had raised several prejudicial inferences not linked to expert testimony indicating that these incidents constituted a breach of defendant's duty of care, including: placing the prosthesis into infected tissue; defendant's removal of the implant with his bare hands in his office rather than in a hospital; the type of sutures used; the use of drains; the failure to consult with an infectious disease specialist; failure to explain various risks; and the comment of plaintiff's daughter that they had lost their house. Finding that the evidence complained of related either to deviations from the standard of care or to plaintiff's damages, the court denied the motion for a mistrial. The court also refused defendant's request that the jury be admonished to disregard some of the evidence. The court then denied defendant's motion for a directed verdict.

Pursuant to the court's prior determination, plaintiff's attorney was allowed to read from a life expectancy table that the average life expectancy for a white female at age 44, plaintiff's age at the time of the surgery, is 36.3 years. The life expectancy for a white female at age 52, plaintiff's age at trial, is 29.1 years.

Dr. John Landes then testified for defendant. Landes had treated plaintiff since the mid-1970s. Dr. Landes testified that, in 1981, plaintiff was suffering from moderately severe fibrocystic disease. Dr. Landes advised plaintiff that she had the option to have the breast tissue removed and replaced by a prosthesis. According to Dr. Landes, plaintiff initially elected not to undergo the surgery. After cysts in plaintiff's breasts were aspirated, Dr. Landes recommended that plaintiff consult with defendant regarding a possible subcutaneous mastectomy. Dr. Landes testified that he would not recommend such surgery unless it was necessary.

Testifying in his own behalf, defendant stated that, as a surgeon, he deals with surgical options for dealing with fibrocystic disease but does not actually treat the disease. That role is served by the general physician rather than the surgeon. Defendant stated that, although there was no clinical evidence of acute infection, he prescribed antibiotics for plaintiff as a prophylactic measure to guard against possible infection.

Dr. Raymond Warpeha, a plastic surgeon and an instructor of surgery and anatomy at Loyola Medical Center, testified as an expert for defendant. Dr. Warpeha had an opportunity to review plaintiff's medical records to help him form his opinions regarding the adequacy of care provided by defendant. Dr. Warpeha testified that it was the responsibility of plaintiff's general doctor to recommend a conservative course of treatment. He testified that such treatments reduce the patient's pain somewhat but are rarely generally successful in the treatment of the disease itself. In Dr. Warpeha's opinion, it would constitute a breach of the duty of care for a doctor to perform surgery without fully explaining the risks.

Dr. Warpeha testified that the standard incision used in a subcutaneous mastectomy is inframammary. He further testified that plaintiff's complications were not unusual for patients who have undergone a subcutaneous mastectomy and could occur in the absence of negligence by the physician. Plaintiff's complications, Dr. Warpeha opined, could have been the result of poor circulation which, in turn, would be aggravated by plaintiff's smoking. Dr. Warpeha was of the opinion that defendant did not deviate from accepted practice in his treatment of plaintiff. He further stated that it was appropriate for defendant to remove plaintiff's prosthesis in his office when it began to emerge from the wound. On cross-examination, Dr. Warpeha stated that it would be a deviation from the standard of care for a surgeon to perform a subcutaneous mastectomy without first examining the patient. He stated that approximately 10% of such patients experience complications.

Plaintiff's attorney began his closing argument by stating that he had experienced "a real hard time *** keeping [his] emotions under control" and that he "couldn't hardly handle [his] emotions with reference to" plaintiff. When he later stated that "it would be real hard for a man to put themselves [sic] in" plaintiff's shoes, defense counsel's objection was sustained. Plaintiff's attorney stated that, "[n]obody, not one of us, would ever trade any amount of money to change our lives the way Barbara's has been changed." Later, he stated the following:

"There is [sic] some professionals that make $300,000 in a given year, professional football players, look what they're making. Yeah, we don't make that kind of money. Look what a house is making. Would any of us go through those experiences that [plaintiff has] gone through and trade them for a house?"

Defense counsel's objection was sustained. Plaintiff's attorney later argued:

"You have heard her testimony as to the daughters, the kind of house that they have had before this happened, a loving happy house; lots of activities that they did together."

Defendant's attorney did not object to this statement.

Later, plaintiff's attorney again asked the jury to place itself in plaintiff's shoes, and defendant's objection was sustained. At the conclusion of plaintiff's argument, defendant complained about such statements outside the jury's presence:

"MR. STRELECKY [defense counsel]: *** I don't want to move for a mistrial, but I don't know how we overcome that kind of error.

THE COURT: Well, I guess the answer is just simply to admonish the jurors that it is not proper for them to place themselves in the shoes of the plaintiff. That's what I'll do when they come back.

MR. STRELECKY: Fine."

When the jury returned, the court stated:

"THE COURT: *** It would not be proper for your [sic] to consider the personal opinions of Mr. Gooding or the request that you place yourselves in the shoes of the plaintiff.

The rest of his argument was entirely proper, but on those items it would not be proper for you to consider that."

Defendant did not object to the court's statement.

The jury returned a general verdict in favor of plaintiff for $675,000, and defendant now appeals.

Defendant's first argument on appeal is that Judge Colwell improperly reversed the prior order entered by Judge Dixon on November 10, 1988, allowing plaintiff to utilize Dr. Schultz as a "witness/treating physician but not as an expert on the issue of the alleged negligence of defendant." Judge Dixon's ruling was apparently based on Supreme Court Rule 220(b), which requires the disclosure of expert witnesses at least 60 days before trial. 134 Ill. 2d R. 220(b).

■■ ■ A court is not bound by an order previously entered by a different judge in the same case and has the power to correct orders which it considers erroneous. A previous order committed to a judge's

discretion is unlikely to be erroneous, but there are circumstances when it can be overturned. (*McClain v. Illinois Central Gulf R.R. Co.* (1988), 121 Ill. 2d 278, 287, 520 N.E.2d 368.) Prior interlocutory orders should be vacated or amended by a successor judge only after careful consideration, especially if there is evidence of judge shopping. (*Towns v. Yellow Cab Co.* (1978), 73 Ill. 2d 113, 121, 382 N.E.2d 1217.) In the context of discovery, it is particularly appropriate for a judge before whom a motion for reconsideration is pending to exercise considerable restraint in reversing or modifying previous rulings. A successor judge should revise or modify previous discovery rulings only if there is a change of circumstances or additional facts which would warrant such action. *Balciunas v. Duff* (1983), 94 Ill. 2d 176, 188, 446 N.E.2d 242.

The parties are not in agreement as to when Judge Colwell actually reversed the November 10, 1988, order. Defendant takes the position that the order was reversed on March 9, 1990, at the beginning of trial. Plaintiff, on the other hand, suggests that Judge Colwell's order of February 16, 1989, which was issued in response to defendant's motion to limit plaintiff's use of Dr. Schultz as an expert, constitutes the point at which Judge Dixon's prior order was reversed. The February 16, 1989, order merely granted defendant "leave to subpoena the deposition of plaintiff's treating physician, Dr. Richard Schultz."

The record provides support for plaintiff's position. Defendant's motion asked the court to prevent Dr. Schultz from testifying as an expert, but the order entered by Judge Colwell on February 16 did not express such a limitation. There is no report of proceedings corresponding to a hearing on the motion. The record reveals simply that plaintiff disclosed Dr. Schultz as an expert and that defendant asked to exclude such expert testimony, but the court's order does not contain such a limitation. Moreover, during trial Judge Colwell said of Judge Dixon's prior order, "if we've got an order which is after that, that covers this problem," indicating that the February 16 order changed the substance of Judge Dixon's order. Resolving any doubts raised by the incompleteness in the record against the appellant (*Foutch v. O'Bryant* (1984), 99 Ill. 2d 389, 392, 459 N.E.2d 958), we conclude that Judge Colwell reversed Judge Dixon's order on February 16, 1989, not in March 1990.

Based on this conclusion, we believe that defendant has not demonstrated any error in Judge Colwell's reversal of Judge Dixon's prior order. Although such a reversal would have been appropriate only if there had been a change of circumstances or additional facts

(*Balciunas*, 94 Ill. 2d at 188, 446 N.E.2d at 247), where, as here, there is not a complete record of the proceedings at trial, it will be presumed that the order entered by the trial court was in conformity with law and had a sufficient factual basis. *Foutch*, 99 Ill. 2d at 391-92, 459 N.E.2d at 959.

Additionally, the record does demonstrate a change in circumstance in two respects. First, Judge Colwell's ruling, unlike Judge Dixon's, was made at a time when trial was more than 60 days away. Second, developing case law, of which Judge Dixon was apparently unaware when he made his ruling, suggests that a treating physician is not considered an expert under Rule 220.

■ In *Tzystuck v. Chicago Transit Authority* (1988), 124 Ill. 2d 226, 237, 529 N.E.2d 525, the supreme court held that treating physicians are not expert witnesses within the meaning of Supreme Court Rule 220. The court reasoned that, while treating physicians may give opinions at trial, these opinions are developed in the course of treating the patient and are completely apart from any litigation. *Tzystuck*, 124 Ill. 2d at 234, 529 N.E.2d at 529-30.

■ In *Wilson v. Chicago Transit Authority* (1988), 126 Ill. 2d 171, 176, 533 N.E.2d 894, the supreme court restated that Rule 220's disclosure and discovery provisions do not apply to treating physicians. The court stated that parties must guard against surprise in a treating physician's testimony through adequate trial preparation, not by reliance on the protections of Rule 220. *Wilson*, 126 Ill. 2d at 176, 533 N.E.2d at 897.

■ Most recently, the court held that a defendant-physician may give testimony at trial, including testimony as to the standard of care, even though he has not been disclosed as an expert witness. The nature of his opinion testimony is subject to the discovery process applicable to ordinary witnesses. *Fawcett v. Reinertsen* (1989), 131 Ill. 2d 380, 384-85, 546 N.E.2d 558.

■ Defendant suggests that a treating physician must be considered a Rule 220 expert when his testimony is based on facts not learned in the course of treatment. The supreme court has not directly addressed this issue, although it had unequivocally stated that Rule 220 does not apply to treating physicians. (*Wilson*, 126 Ill. 2d at 176, 533 N.E.2d at 897.) A recent appellate court opinion held that a defendant cannot complain of surprise when a disclosed treating physician gives expert testimony based on facts not learned in his treatment. (*Cochran v. Great Atlantic & Pacific Tea Co.* (1990), 203 Ill. App. 3d 935, 941, 561 N.E.2d 229.) Thus, although the issue is not squarely presented here, we conclude that Judge Colwell's order was

in conformity with the law which developed after Judge Dixon's .order was issued.

■■ Defendant also argues that the trial court erroneously denied him the opportunity to depose Dr. Schultz when he requested the opportunity to do so during trial. However, defendant had been given the opportunity to depose Dr. Schultz earlier and elected not to do so only because of the potential cost. As the trial court noted, defendant could have pressed for a resolution to this problem but chose not to. Defendant's argument that his decision in this regard was made in reliance on Judge Dixon's order is unpersuasive given our determination that this order was reversed more than a year before trial.

Defendant's next argument focuses on the cumulative effect of improper and irrelevant evidence. During oral argument, defendant clarified that the alleged error in this evidence is not always relevance *per se* but the fact that the evidence was never tied up with expert testimony showing a breach of the duty of care. Because the evidence complained of can be grouped into five different categories, we examine each separately.

■■ First, defendant contends that testimony regarding the type and number of sutures used and the use of drains was irrelevant. In determining relevancy, the trial court must consider the evidence in light of the factual issues raised by the pleadings. (*Schneiderman v. Kahalnik* (1990), 200 Ill. App. 3d 629, 635-36, 558 N.E.2d 334.) Here, the type of sutures appears to be irrelevant to any acts of negligence alleged in the pleadings, but testimony as to the number of sutures used and the use of drains would. arguably be relevant to show plaintiff's post-operative condition. In any event, defendant never objected to this testimony. A court is not required to exclude objectionable evidence absent an objection. (*Casson v. Nash* (1978), 74 Ill. 2d 164, 171, 384 N.E.2d 365.) Defendant has, therefore, waived any objection to this evidence.

■■ Second, defendant contends that testimony regarding the method of subcutaneous. mastectomy utilized. by defendant should not have been allowed absent expert testimony showing that the choice of methodology constituted a breach of defendant's duty of care. We note that defendant did not object to this testimony when it was given, and he did not raise this issue in his second motion for a mistrial. Moreover, we believe that Dr. Befeler's testimony regarding the greater risks associated with the submammary approach to the subcutaneous mastectomy was pertinent to the issue of defendant's failure to adequately inform plaintiff of the risks associated with her surgery.

■■ Third, defendant argues that testimony pertaining to defendant's failure to inform plaintiff of the risks associated with her follow-up surgeries should not have been allowed because, once again, there was never any expert testimony that linked defendant's conduct to a breach of his duty of care. We agree. However, defendant never objected to this testimony when it was given. Additionally, plaintiff's closing argument did not dwell on or in any way mention this isolated remark. We therefore find that any error in the admission of this testimony did not prejudice defendant.

■■ Fourth, defendant argues that plaintiff was improperly allowed to present testimony regarding defendant's cleanliness and the reimplantation of the prosthesis into infected tissue without corresponding expert testimony that this conduct violated defendant's duty of care. However, defendant successfully objected to the testimony regarding cleanliness. This is generally sufficient to correct the error. See *People v. Cisewski* (1987), 118 Ill. 2d 163, 178, 514 N.E.2d 970.

Although there was evidence of infection in plaintiff's left breast, defendant is correct in his contention that plaintiff never presented expert testimony showing that reimplantation of the prosthesis into the infected tissue violated defendant's duty of care.

Plaintiff's attorney indicated at a sidebar that Dr. Schultz would provide such testimony, and Dr. Schultz testified that infection is a risk of the subcutaneous mastectomy and that he avoids implantation of a prosthesis into infected tissue. Plaintiff appeared to have laid the proper foundation for Dr. Schultz to testify as to a breach of the standard of care by establishing that he had spoken with plaintiff about her condition and had reviewed her medical records. (See *Melecosky v. McCarthy Brothers Co.* (1986), 115 Ill. 2d 209, 216, 503 N.E.2d 355 (expert medical testimony may be given on the basis of statements made to the expert by the patient).) However, when plaintiff's counsel asked Dr. Schultz whether reimplantation of the prosthesis into infected tissue would constitute a breach of the standard of care, defendant's objection was sustained by the trial court.

■■ Under these circumstances, where plaintiff's failure to elicit Dr. Schultz's expert opinion in the proper form was due to the improper sustaining of defendant's foundational objection by the trial court, we do not believe it would be appropriate to fault plaintiff for the absence of this testimony. Although it could constitute reversible error if the failure to tie up the evidence was the result of bad faith (see *Karsten v. McCray* (1987), 157 Ill. App. 3d 1, 9-10, 509 N.E.2d 1376), where, as here, plaintiff's attorney failed in his attempt to tie up the evidence because of the court's incorrect sustaining of defend-

ant's objection, we cannot assume defendant was prejudiced (see *Gowler v. Ferrell-Ross Co.* (1990), 206 Ill. App. 3d 194, 205, 563 N.E.2d 773). Viewing the issue in all of its relevant aspects, we do not believe defendant was prejudiced in any way by the absence of Dr. Schultz's testimony phrased in the precise manner normally utilized for expert opinions.

 Finally, defendant contends that testimony relating to plaintiff's financial condition was improperly allowed into evidence. When only compensatory damages are at issue, the parties' financial conditions are irrelevant and often prejudicial. If undue emphasis is placed on such irrelevant evidence, or if the jury's verdict is affected by it, then reversal is required. *Pagel v. Yates* (1984), 128 Ill. App. 3d 897, 902, 471 N.E.2d 946.

 Defendant notes that, on two occasions, testimony was allowed which suggested the impecunious nature of plaintiff's financial condition. The first was when plaintiff testified, over defendant's objection, that she did not have further reconstructive surgery because she could not afford it. It is difficult to conclude that this isolated reference, which was not referred to subsequently in argument, affected the jury's verdict. We conclude that any error in the admission of this testimony is not a ground for reversal.

 The second incident was when plaintiff's daughter testified, "[w]e lived off our two paychecks, so we lost our house." Defendant's objection to this statement was sustained, and the court instructed the jury to disregard it. Defendant argues that plaintiff's attorney compounded the effect of this statement in closing argument by stating, "Look what a house is making. Would any of us go through those experiences *** and trade them for a house?" Defendant's objection to this nonsensical remark was also sustained, and the link to the statement made by plaintiff's daughter is so weak that it is impossible to conclude defendant could have been prejudiced by this remark.

 Defendant also refers to the statement in plaintiff's closing argument regarding "the kind of house [plaintiff's family] had before this happened, a happy, loving house." However, defendant did not object to this statement which, once again, is of the most obscure relationship to plaintiff's financial condition. In the absence of an objection, which would have given the trial court the opportunity to ameliorate any prejudice by a curative instruction, it must be assumed that the jury had the ability to separate inflammatory and emotional rhetoric from the relevant facts in the case. *Marotta v. General Motors Corp.* (1985), 108 Ill. 2d 168, 179, 483 N.E.2d 503.

 In conclusion, we believe that the majority of the evidence and argument complained of was either not objected to, or successfully objected to, by defendant. Much of the remaining evidence is relevant to the question of plaintiff's damages, because evidence of an injured person's general health and physical condition following the injury may be admissible to show the nature, extent and probable effect of the injury (*O'Brien v. Thomas Steel Corp.* (1989), 181 Ill. App. 3d 901, 905, 538 N.E.2d 1162). Although some evidence was improperly admitted over defendant's objection, a party is not entitled to reversal and a new trial based on evidentiary rulings unless the error was prejudicial or affected the outcome of the trial. (*J.L. Simmons Co. ex rel. Hartford Insurance Group v. Firestone Tire & Rubber Co.* (1985), 108 Ill. 2d 106, 115, 483 N.E.2d 273.) The burden is on the party seeking reversal to establish prejudice. (*Cairns v. Hansen* (1988), 170 Ill. App. 3d 505, 511, 524 N.E.2d 939.) We find that, after reviewing the entire record, defendant has failed to demonstrate substantial prejudice from improper evidence.

Defendant's next contention is that the trial court erred in allowing Dr. Befeler to refer to previously undisclosed medical publications in his evidence deposition. In his discovery deposition of October 11, 1988, Dr. Befeler testified that, although he had read the medical literature on the subcutaneous mastectomy, he could not identify any specific article or treatise. Plaintiff's answers to defendant's supplemental interrogatories as to what medical texts would be relied on stated only, "to be determined." However, in his February 7, 1990, evidence deposition, Dr. Befeler referred to certain books and articles. Defendant argues that Supreme Court Rule 220(c)(3) (134 Ill. 2d R. 220(c)(3)) required plaintiff to seasonably supplement disclosure to alert defendant that these articles would be relied on by Dr. Befeler in his testimony.

 █ Admission at trial of evidence which should have been disclosed through discovery is not reversible error absent proof that it resulted in prejudice. (*Wilson v. Norfolk & Western Ry. Co.* (1982), 109 Ill. App. 3d 79, 85, 440 N.E.2d 238.) While Dr. Befeler was improperly allowed to refer to certain undisclosed medical books and articles, we believe that his statements with regard to these articles were not prejudicial to defendant. The trial court did, in fact, preclude reference to certain other articles, and the remaining references referred to only the general nature of these texts. Such references neither supported specific portions of Dr. Befeler's testimony nor altered the opinion voiced in his discovery deposition. In essence, the limited testimony relating to the medical texts established only that the au-

thorities cited deal with the subject of complications from a subcutaneous mastectomy, but, aside from this, no specifics from the texts were testified to by Dr. Befeler. Accordingly, we find no prejudice.

■ Defendant next argues that plaintiff's attorney engaged in improper final argument which necessitates a new trial. Defendant correctly notes that it was improper for plaintiff's attorney to ask the jury to put itself into plaintiff's position. (*Chakos v. Illinois State Toll Highway Authority* (1988), 169 Ill. App. 3d 1018, 1029, 524 N.E.2d 615.) However, defendant's prompt objections to these remarks were sustained by the trial court, and, with defense counsel's agreement, the jury was instructed to disregard such improper statements. This is sufficient to have cured any prejudice arising from the improper argument. (*Webb v. Angell* (1987), 155 Ill. App. 3d 848, 852, 508 N.E.2d 508.) Defendant's suggestion that the trial court's curative comments were vitiated by his statement that "the rest of [plaintiff's counsel's] argument was entirely proper" is speculative and does not detract from the curative effect of the court's comments.

Next, defendant contends that the trial court improperly acted as an advocate for plaintiff. Defendant notes that, on three occasions, the trial court called the attorneys into his chambers and suggested ways in which plaintiff's attorney could overcome defendant's foundational objections in the questioning of Dr. Schultz to elicit his expert opinion.

■ We note that defendant never objected to the trial court's conduct in this regard, so the question has not been properly preserved for review. (See *Hargrove v. Gerill Corp.* (1984), 124 Ill. App. 3d 924, 929, 464 N.E.2d 1226.) Moreover, it is not clear that there is merit to defendant's argument. A trial court may properly give its reasons for ruling upon evidence and must be accorded a reasonable degree of latitude in so doing. (*County of Cook v. Colonial Oil Corp.* (1958), 15 Ill. 2d 67, 70, 153 N.E.2d 844.) The trial court's explanation of the deficiencies in the foundational questions asked by plaintiff's counsel can be viewed as merely explanatory and is not uncommon in civil trials. All such comments were made outside the presence of the jury, and the judge never truly acted as an advocate for plaintiff.

Finally, defendant contends that the $675,000 verdict returned in favor of plaintiff was so excessive that it could only have been the result of the improper evidence and argument to which the jury had been exposed. The amount of a verdict is generally within the discretion of the jury (*Paulan v. Jett* (1989), 190 Ill. App. 3d 497, 500, 545 N.E.2d 1377), and the jury's verdict will stand unless it is so large as to indicate it is the result of passion or prejudice (*Lynch v. Board of*

*Education of Collinsville Community Unit District No. 10* (1980), 82 Ill. 2d 415, 437, 412 N.E.2d 447).

Here, defendant assails the amount of the jury's award on two bases. First, defendant notes that plaintiff's lost income, medical expenses and the cost of future surgery would total approximately $64,300. However, the award also covered other damages such as pain and suffering and disfigurement. We cannot conclude that the award of damages here is the result of passion or prejudice.

■ Second, defendant contends that, despite the fact that the life expectancy table was read to the jury, there was no evidence that plaintiff's injury was permanent. Even where an injury results in recurring pain, the life expectancy of the sufferer is a factor only when the injury is permanent. (*Savka v. Smith* (1978), 58 Ill. App. 3d 12, 17-18, 373 N.E.2d 1051.) Here, however, Dr. Schultz testified that plaintiff's condition could result in permanent disfigurement and disability, and Dr. Befeler's testimony clearly linked her condition to the surgery performed by defendant. This is sufficient evidence of the permanence of plaintiff's injury. See *Melford v. Gaus & Brown Construction Co.* (1958), 17 Ill. App. 2d 497, 505-06, 151 N.E.2d 128.

Although defendant has exhaustively brought to our attention a number of errors precipitated by plaintiff's counsel throughout the lengthy trial, we are satisfied from our review of the entire record that these errors did not affect the outcome below. While we wish that every trial could be free from error (*J.L. Simmons*, 108 Ill. 2d at 115, 483 N.E.2d at 277), the reality is that a perfect, error-free trial is seldom the case. Litigants are entitled to a fair trial, not one which is error free. (*Oko v. Rogers* (1984), 125 Ill. App. 3d 720, 724, 466 N.E.2d 658.) All the reviewing court can do is to assess whether the error was prejudicial or affected the outcome. In this case, we do not find it so.

The judgment of the circuit court of Kane County is affirmed.

Affirmed.

WOODWARD and INGLIS, JJ., concur.