DONALD P. KRAMER, Independent Ex'r of the Estate of Lillian Kramer, Deceased, *et al.*, Plaintiffs-Appellants, v. LARRY S. MILNER, Defendant-Appellee.

First District (1st Division) No. 1—92—1851

Opinion filed August 8, 1994.

Drumke & Patterson, Ltd., of Chicago (Robert B. Patterson and Danielle M. Jaeschke, of counsel), for appellants.

Pretzel & Stouffer, Chartered (Robert Marc Chemers and Scott O. Reed, of counsel), and Rook, Pitts & Poust (Jerome N. Groark and Patricia C. Nowak, of counsel), both of Chicago, for appellee.

JUSTICE O'CONNOR delivered the opinion of the court:

Milton Kramer's wife, Lillian Kramer, died of breast cancer on August 13, 1990, at the age of 74. The cancer was detected in October 1988, after a screening mammogram had been recommended by her then doctor, Noel Browdy, M.D. A biopsy performed on October 19, 1988, indicated that Lillian Kramer was suffering from "advanced intraductal and infiltrating ductal adenocarcinoma" in her right breast. Kramer had a mastectomy on November 1, 1988, which was followed by six months of chemotherapy. However, testing in November 1989 indicated that Kramer's cancer had spread to her liver and bones. Her condition deteriorated thereafter until her death.

Plaintiffs Milton Kramer, Lillian's husband, and Donald P. Kramer, the executor of Lillian's estate, brought this action against defendant Larry S. Milner, M.D., alleging that Dr. Milner had been negligent in treating Lillian during the three years prior to the detection of her cancer. Specifically, the Kramers alleged that Dr. Milner violated the standard of care for treating physicians by failing to recommend or order a screening mammogram for Lillian at any time between the date he began treating her as her general physician

on November 1, 1985, and the date she left his care on September 9, 1988. A jury found Dr. Milner not negligent. The Kramers appeal. We reverse and remand for a new trial

On appeal, the relevant evidence concerns exclusively the standard of care between November 1985 and September 1988 regarding the detection of breast cancer in women over the age of 50. The Kramers presented the testimony of Lillian's treating physician, Dr. Browdy, who testified to the standard of care for internists in the northern suburbs of Chicago during the time at issue. At that time, internists referred for annual mammograms those patients over the age of 50 who had a sister diagnosed with breast cancer. Lillian Kramer had a sister who had had breast cancer and who was also treated by Dr. Milner. Lillian was just shy of 70 when she began seeing Dr. Milner.

Plaintiff also presented the expert testimony of Dr. William D. Shorey, a general surgeon. Dr. Shorey testified that between 1985 and 1988, the time period during which Dr. Milner treated Lillian, the standard of care required that an annual mammogram be ordered for all women over 50 whose mother or sister had had breast cancer. Dr. Shorey based his opinion regarding the standard of care on publications from the American College of Radiology, the National Cancer Institute (NCI), the American Medical Association, and the American College of Physicians. Dr. Shorey concluded that Dr. Milner violated the standard of care by not referring Lillian for mammography between 1985 and 1988.

Dr. Shorey conceded that certain recommendations as to care by the American Cancer Society (ACS) and the NCI were only guidelines, rather than requirements. Nonetheless, he testified that a doctor, such as Dr. Milner, who did not follow these guidelines violated the standard of care. Had Lillian's cancer been detected at a much earlier stage, she would have had an 80% chance of survival.

Dr. Shorey testified that he concluded from the ACS survey that his opinion represented the standard of care because the ACS survey showed that between 1985 and 1988, 80% to 90% of doctors followed the recommendations of the ACS. He stated that when a woman, like Lillian, had no personal history of breast cancer, 97% of doctors performed manual breast examinations. Only 49% of doctors ordered a mammogram in such cases. Dr. Shorey testified that in 1984, the ACS recommendations showed that only 9% of all women were ordered to have a mammogram, and by 1989, this figure had risen to 37%. These figures were not broken down according to age group.

Defendant presented the expert testimony of Harvey Morris Golomb, M.D., a specialist in hematology, who was familiar with the

ACS guidelines for screening mammography in women over age 50. He testified that the ACS guidelines, as well as recommendations made by other medical organizations, were only "signposts" to assist an internist in practice and were "clearly not standards of practice." Specifically, he asserted that the ACS guidelines in existence on November 1, 1985, recommending screening mammography for women over 50 years old did not establish the standard of care for a specialist in internal medicine in 1985. He stated likewise for NCI recommendations. Golomb further stated that since the time screening mammography had first been recommended by the ACS in 1976, the various medical associations had not been able to establish a uniform guideline for practitioners.

Dr. Golomb testified that Dr. Milner did not violate the standard of care in treating Lillian. Dr. Milner performed clinical breast examinations on Lillian four times in three years. Furthermore, Lillian had never registered a complaint about her breasts during any of her visits to Dr. Milner. Dr. Golomb noted that Lillian was asymptomatic when she first visited Dr. Milner on November 1, 1985, and remained so throughout her three years visiting him. Indeed, when Lillian presented herself to Dr. Browdy, she was still asymptomatic. Thus, had she been given a mammogram in her early treatment with Dr. Milner, the cancer may not have been detectable. Dr. Golomb concluded that Lillian's was an aggressive cancer and that it would not have been diagnosable early enough to affect treatment.

Dr. Golomb said that the fact that Lillian's sister had breast cancer was not relevant given Lillian's age. As women increase in age, and certainly when a woman is over 70, family history shrinks in importance and age becomes the primary indicator for treatment. Plaintiff's expert, Dr. Shorey, agreed with this assessment.

Dr. Milner testified that he considered his treatment of Lillian to be within the standard of care. He generally orders screening mammography on all women over 40, and for women over 50, he orders them every one to three years. However, if an asymptomatic 70-year-old woman comes to Dr. Milner with no prior history of cancer and does not register complaints about her breasts and does not request a mammogram, he would not order one. However, he said that, in such cases, he increases the frequency of office visits and breast examinations to three or four per year.

A jury found Dr. Milner not negligent in his care of Lillian. Donald Kramer appeals.

Kramer argues that the trial court improperly instructed the jury on the applicable standard of care. The trial judge gave Illinois Pattern Jury Instructions, Civil, No. 105.01 (3d Ed. 1990) (IPI Civil 3d), which states:

"In providing professional services to [patient's name], a [insert appropriate professional person] must possess and apply the knowledge and use the skill and care ordinarily used by a reasonably well-qualified [insert appropriate professional person] [practicing in the same or similar localities] under the circumstances similar to those shown by the evidence. A failure to do so is professional negligence.

[The only way in which you may decide whether (a) (any) defendant possessed and applied the knowledge and used the skill and care which the law required of him is from (expert testimony) (and) (or) (evidence of professional standards or conduct) presented in the trial. You must not attempt to determine this question from any knowledge you have.]"

In giving the instruction, the trial judge excluded the parenthetical "evidence of professional standards or conduct." Kramer contends that this was error. The parenthetical at issue was added to IPI Civil 3d No. 105.01 in 1990 and has not yet been the subject of appellate review.

The IPI Notes on Use state that the parenthetical "may be used in situations where the proper standard of care may be proven by other than expert testimony." Thus, although a party is entitled to have the jury instructed on his theory of the case (see *Aimonette v. Hartmann* (1991), 214 Ill. App. 3d 314, 574 N.E.2d 776, *appeal denied* (1991), 141 Ill. 2d 535, 580 N.E.2d 107), as with other instructions, the usage notes indicate that inclusion of this parenthetical is discretionary with the trial court, and an appellate court will not disturb a trial court's ruling on jury instructions absent a clear abuse of discretion. *Hollembaek v. Dominick's Finer Foods, Inc.* (1985), 137 Ill. App. 3d 773, 484 N.E.2d 1237.

In excluding the parenthetical, the trial court noted that, in this case, there was no evidence of professional standards, but rather various guidelines, the impact of which the experts disagreed. The trial court was concerned about confusing the jury by instructing it about the presence of professional "standards," as such. Furthermore, the judge explained that to the extent there was evidence of professional standards, it came in through the expert testimony. Thus, the judge was concerned about being either duplicative or misleading the jury.

Kramer argues that because the experts' testimony was based in part on surveys of physician practice conducted by various medical associations, the record included evidence of professional standards and conduct, and hence, the trial court should have included the parenthetical. Dr. Milner counters that, in this case, the experts did

not agree on the weight that the professional community accorded the surveys at issue and that under *Young v. Cerniak* (1984), 126 Ill. App. 3d 952, 467 N.E.2d 1045, the parenthetical should only be given where there is nonconflicting evidence of professional standards. We cannot agree with this view of IPI Civil 3d No. 105.01, and therefore, we find that the trial court's decision to withhold the parenthetical was an abuse of discretion requiring a new trial in this matter.

In *Young,* the trial court had given the jury a plaintiff's instruction which explicitly instructed the jury to consider a drug manufacturer's recommendations and a hospital's policies to determine the standard of care. On appeal, the court reversed, stressing that the evidence regarding the appropriate standard of care was conflicting and that the drug manufacturer's recommendations and the hospital policies merely embodied the plaintiff's version of the case. (*Young,* 126 Ill. App. 3d at 972.) Here, however, the plaintiff only sought inclusion of the parenthetical, which is a general instruction regarding professional standards or conduct, not focusing on either party's theory of the case. Thus, *Young* is not controlling.

The "evidence of other professional standards" upon which Kramer bases his argument consisted of published medical association guidelines from which the experts deduced a standard of care. Although these surveys were not admitted into evidence, the expert witnesses relied extensively on them, to the point of opining whether the publications stated the applicable standard of care. Dr. Shorey, plaintiff's expert, stated that the surveys did establish the standard of care. Dr. Golomb, defendant's expert, stated they did not establish the standard of care. Thus, the jury was well exposed to the contents of these documents.

The trend in Illinois has been to admit a range of evidence, beyond mere expert testimony, to enable a plaintiff to establish the standard of care in a medical malpractice case. (See, *e.g., Ohligschlager v. Proctor Community Hospital* (1973), 55 Ill. 2d 411, 303 N.E.2d 392; *Smith v. South Shore Hospital* (1989), 187 Ill. App. 3d 847, 543 N.E.2d 868; *Northern Trust Co. v. Louis A. Weiss Memorial Hospital* (1986), 143 Ill. App. 3d 479, 493 N.E.2d 6.) This trend is embodied by the amendment of IPI Civil 3d No. 105.01 to include the parenthetical at issue.

●1 We do not agree that inclusion of the parenthetical requires, as Dr. Milner urges, that the record contain uncontested "evidence of professional standards or conduct." Indeed, medical expert testimony, by its very nature, is contradictory. Two qualified experts on opposing sides of litigation, viewing the same injury, invariably reach different

conclusions as to causation. Likewise, the experts in this case analyzing the same statistical data interpreted it differently. We are concerned that, in a case like this one, to not include the parenthetical might mislead the jury into believing that it was not entitled to consider the basis of the expert opinion.

In any event, the expert testimony analyzing the compliance rates of doctors with ACS and other organizations' recommendations—evidence offered by the defense—constitutes "evidence of professional *** conduct" as contemplated by IPI Civil 3d No. 105.01. Thus, we believe the trial court abused its discretion in not including the parenthetical phrase in the jury instructions. Thus, we reverse the judgment below and remand this case for a new trial.

To the extent that the remaining claims raised by Kramer affect a retrial in this matter, we examine them.

Kramer claims that the trial court erred in denying his motion *in limine* seeking to bar Dr. Milner from cross-examining Dr. Shorey about physician compliance data contained in the two ACS surveys, upon which Shorey relied in forming his opinion regarding the standard of care. Dr. Shorey testified that the surveys recommended annual screening mammography for women over age 50. On cross-examination, the defense elicited from Dr. Shorey the low incidence of screening mammography ordered by doctors for all women during the years Dr. Milner treated Lillian. Dr. Shorey denied that the physician compliance rate was relevant to the determination of the standard of care. However, the defense impeached this statement with Dr. Shorey's deposition testimony, in which he had stated that the compliance rates were significant in determining the standard of care.

Kramer argues that the testimony regarding physician compliance permitted by the trial court misled the jury because although the survey's recommendations regarding frequency of mammography were made by age group, the compliance rates were not. Thus, according to Kramer, the jury might have concluded that mammography rates for women over 50 were the same as for women of all age groups when, in fact, nothing in the surveys suggested such a conclusion.

●2 Because Dr. Shorey relied on the ACS survey to form his opinions regarding standard of care, the defense was entitled to leeway in cross-examining him about the surveys to help the jury determine the weight to be given his conclusions. Furthermore, on redirect examination, Kramer had every opportunity to correct any false impression that might have been made in the revealing of the physician compliance data.

Finally, Kramer contests the trial court's decision to permit Dr. Milner to testify to background information about his family and about his prior care of Lillian. Illinois has adopted Federal Rule of Evidence 401 (see *People v. Monroe* (1977), 66 Ill. 2d 317, 362 N.E.2d 295), which gives the trial court wide discretion to admit various background evidence. *Leggett v. Kumar* (1991), 212 Ill. App. 3d 255, 570 N.E.2d 1249.

●3 In his testimony, Dr. Milner testified, over objection on relevancy grounds, that he was married and had three daughters, "one married; one engaged; one in college." Kramer contends that this testimony was elicited to appeal to the sympathy of the jury. We fail to perceive how this single question could have prejudiced Kramer's case.

Dr. Milner also testified about his three years treating Lillian as her primary physician. He noted the various ailments from which she, as a typical 70-year-old, suffered. As far as its admissibility on retrial, Kramer has not explained how any of the testimony challenged was error, let alone prejudicial in any manner.

Reversed and remanded for a new trial.

CAMPBELL, P.J., and BUCKLEY, J., concur.