DAVID E. HARDING, Plaintiff-Appellant, v. AMSTED INDUSTRIES, INC., *et al.*, Defendants and Third-Party Plaintiffs-Appellees (Thrall Car Manufacturing Company, Third-Party Defendant-Appellee).

First District (1st Division)   No. 1—93—2346

Opinion filed November 20, 1995.

Bell, Boyd & Lloyd, of Chicago (William L. Barr, Jr., and Daniel Lawler, of counsel), for appellant.

Robert M. Burke and Janet A. Kachoyeanos, both of Johnson & Bell, Ltd., of Chicago (Thomas H. Fegan and Mindy Kallus, of counsel), for appellees Amsted Industries, Inc., and American Steel Foundries.

Kubiesa, Power & Adams, Ltd., of Oakbrook Terrace (Jeffrey B. Huebsch, of counsel), for appellee Thrall Car Manufacturing Company.

JUSTICE BUCKLEY delivered the opinion of the court:

Plaintiff, David Harding, brought a strict liability action against American Steel Foundries, a division of Amsted Industries, Inc. (ASF), for injuries he allegedly sustained while installing a friction casting manufactured by ASF. ASF in turn filed a third-party complaint for contribution against plaintiff's employer, Thrall Car Manufacturing Company (Thrall). Plaintiff also filed a workers' compensation claim against Thrall before the Illinois Industrial Commission. On December 11, 1992, Thrall filed a motion to dismiss. The circuit court granted Thrall's motion, finding that the settlement between the plaintiff and Thrall was a good-faith settlement for purposes of the Joint Tortfeasor Contribution Act (740 ILCS 100/0.01 *et seq.* (West 1992)). Following a jury trial, judgment was entered upon the verdict in favor of ASF on March 26, 1993. The circuit court denied plaintiff's post-trial motion and motion for leave to file a second-amended complaint on May 28, 1993. Plaintiff appeals the circuit court's orders dismissing the third-party complaint and denying plaintiff's motions.

BACKGROUND

ASF manufactures railroad car parts. The part relevant to this appeal is the friction casting, which is inserted into the wheel assembly of a railroad car and is part of the shock absorbing system. During the wheel-assembly process, four friction castings, each containing two large springs, are pressed into another part called a bolster. This is done with a "bolster press," which consists of a frame on which to place the bolster and four air cylinders. The air cylinders provide the force and energy needed to press the castings into the bolster. At trial, ASF's expert engineer testified that 4,000 pounds of force and 300 foot-pounds of energy are required to compress the springs into the bolster during the installation of the castings.

ASF provides a repair and maintenance manual to purchasers of its friction castings. The manual depicts ASF's recommended method of installing its friction castings, which includes a detailed drawing

with dimensions for the construction of a bolster press. At trial, ASF's sales representative testified that it was reasonably foreseeable that ASF's customers would use the recommended installation method.

The manual also provides instructions and warnings relating to the construction and operation of the bolster press. For example, the manual states:

> "WARNING
>
> Because forces of 6,000 pounds potentially can be developed in using this assembly, it is imperative that all 'SAE-ASTM' standards for welding and practice be followed to insure quality workmanship and strength, and that all materials incorporated in the assembly be of quality and strength to maintain its integrity. Frequent inspection of the assembly should be made for the purpose of identifying any weld or material deficiencies which, if present, should be corrected before resuming utilization of the assembly. Sticking may occur when removing the shoes from the pockets due to friction. Care must be exercised to release the air slowly, being sure that the shoe is following the release."

Plaintiff was injured on June 30, 1986, while he was building a railroad car wheel assembly for Thrall. He alleged that while he was operating a bolster press, a steel fragment broke off of one of the castings manufactured by ASF and became lodged in his leg. Specifically, plaintiff had just opened the air valve on an air cylinder and the piston began pushing a friction casting into place. The friction casting started to fit into place, but then "hung up." By the time plaintiff looked down, the casting had popped into place. He then fell towards the bolster because something had hit him in the leg and he was bleeding. Plaintiff was brought to a medical clinic, where X rays showed that a metallic foreign body was embedded above his left knee. He was later taken to a hospital to have the object surgically removed.

Over the following $2^1/2$ years, plaintiff underwent three more surgical operations to treat the pain and swelling in his knee and the varicose veins in his leg. Plaintiff was unable to work between June 1986 and March 1992, under his doctors' orders. Ultimately, plaintiff voluntarily resigned his position because he was unable to perform his duties at Thrall due to his pain. Plaintiff trained to be a school bus driver and his salary is approximately half of what he was earning at Thrall.

At trial, plaintiff testified that he did not see from where the metal originated. He explained that at the time he was injured, a variety of work activities were taking place nearby connected to the

construction of the railroad cars. Workers in the vicinity were using sledgehammers, pry bars, wedges, and other tools.

Dr. Paul Gordon, a professor of metallurgical engineering, testified that the metallurgical tests performed on the fragment removed from plaintiff's leg showed that the fragment came from a friction casting manufactured by ASF. He also stated that he did not analyze any of the sledgehammers, machinery, or other equipment present in the plant on the day plaintiff was injured. According to Dr. Gordon, a carbon test indicated that the average carbon level found in the fragment exceeded the maximum level stated in ASF's specification. He concluded that the outside surface of the fragment had been struck repeatedly by a piece of metal. He noted, however, that the tests indicated that the fragment contained boron and he had never seen boron contained in a hammer.

Peter Barroso, Jr., a senior mechanical engineer, who was involved in the fields of accident investigation and the analysis of the safety and design of machinery, testified for the defense. According to his calculations, even assuming the casting would break, the velocity of the fragment created during the installation process would be insufficient to penetrate bare skin. Mr. Barroso concluded that the force and resulting stress on the friction casting generated during installation of the casting would be insufficient to cause the friction casting to break. He concluded that the casting was safe for its intended use and that ASF did not need to warn of the danger of flying particles or fragments based on his finding that the casting would not fracture under the pressure of the bolster press.

Stanley Weiss, a Ph.D. specializing in metallurgical engineering, testified that in his opinion, the fragment was caused by a hammering action and did not result from pressing a casting into a bolster. He noted that there were hammering marks on the surface of the fragment and within the fragment. He determined that a heavy blow, rather than a pressing action, caused the fracture. Using a photograph, he explained that the fragment disclosed several hammer marks. He also noted that there were flow marks on the surface of the fragment and if the piece had fragmented because of pressing, the markings would have been uniform. Thus, he concluded that the fracture occurred in a ductile manner. The presence of white sheer bands confirmed that the material fractured because of an extremely high impact. On the subject of carbon content, Dr. Weiss stated that the difference between the carbon level in the fragment and ASF's maximum specification was insignificant and the higher carbon content would not tend to make the material more brittle.

Dr. Weiss described the microstructure of the material as mar-

tensitic and explained that most of the tools used in a railroad car manufacturing plant would have this type of microstructure. The microstructure of the fragment was consistent with any tempered martensite steel such as a sledgehammer, a punch, a slag hammer, or a plate on the foot of a cylinder. Dr. Weiss worked with cast metals that were put under more pressure than the bolster press could generate, and he had never seen a warning that a casting may fragment or fracture during installation or when put under pressure.

Marvin Salzenstein, a consulting engineer, testified for the plaintiff. He concluded that the friction casting was defective and unreasonably dangerous because the carbon content exceeded ASF's specifications and because ASF failed to warn that the friction castings might eject broken fragments during installation. He also stated that a friction casting could break under 6,000 pounds of force, which is the amount of force applied by the air cylinders, according to the ASF's instruction manual. The pressure on the friction casting could build up to 6,000 pounds either when the springs "bottom out" or the friction casting gets "hung up" during installation. In either of these cases the pressure continues to build up in the cylinder as it pushes on the casting. In his words, it finally breaks free and "you finish up the stroke with a whack." He noted that the bolster presses are not high precision machine surfaces and as a result binding is expected to occur. In his deposition, Mr. Salzenstein stated that ASF's drawing of the bolster press was not a manufacturing blueprint that could be used to create the machine. Rather, he characterized it as a procedure for inserting the castings.

Four Thrall employees testified at trial. Robert Holliday testified that he and the plaintiff were working in the main plant on the day of the accident. The activities nearby included burning, fitting, welding and hammering. Fitters, who were 20 to 30 feet from the plaintiff, were using long-handled sledgehammers to strike steel. He also stated that there was danger of flying debris and metal particles throughout the plant. Douglas Grub, the director of safety at Thrall, testified that flying debris was a safety concern at the plant. Charles Carter testified that machines, grinders, and hammers are used in the plant to construct center beams. Finally, Thomas Harding, plaintiff's brother, testified that he was aware of individuals being hurt at the plant by a piece of a sledgehammer coming off during hammering operations as well as by other types of tools breaking or fragmenting. He also stated that in describing the accident his brother told him that an air cylinder had "blown up on him."

The first issue on review is whether the circuit court erred in granting ASF's motion *in limine* to bar plaintiff from presenting any

evidence from which the jury could infer that ASF failed to warn plaintiff of the dangers of operating the bolster press. Although it is unclear from the trial transcript, it seems as though the trial court granted this motion because it found ASF had no duty to warn of dangers relating to operating the bolster press because ASF did not manufacture or design the press. The plaintiff claims that this ruling was in error because although ASF did not manufacture the press, the operation of the press was necessary to the installation of ASF's friction casting and ASF provided instructions relating to the installation.

Plaintiff argues that under Illinois law, a seller's "product" includes specifications or installation instructions. (*Lundy v. Whiting Corp.* (1981), 93 Ill. App. 3d 244, 251, 417 N.E.2d 154, 161.) Plaintiff also notes that the Illinois Appellate Court has held that manufacturers should foresee the effect or consequence of its instructions on the proper use of its product because it is inferred that such instructions will have some effect on the purchaser. (*Wallinger v. Martin Stamping & Stove Co.* (1968), 93 Ill. App. 2d 437, 441, 236 N.E.2d 755, 758.) According to plaintiff, ASF's instructions were defective because they failed to warn of the danger created when a friction casting gets hung up during installation and failed to instruct an installer of the friction casting on how to safely operate the bolster press and protect himself in the event of a hang-up.

ASF argues that it had no duty to warn of the dangers of the bolster press because it did not design or manufacture the press. ASF cites *Baltus v. Weaver, Division of Kidde & Co.* (1990), 199 Ill. App. 3d 821, 833, 557 N.E.2d 580, 588, for the rule that in cases alleging strict liability, the failure to provide adequate warnings must relate to the defendant's product. ASF also cites authority for the rule that a party cannot be held liable for a defect in a product neither manufactured nor designed by him. (*Smith v. F.W.D. Corp.* (1982), 106 Ill. App. 3d 429, 433, 436 N.E.2d 35, 37; *Harms v. Caterpillar Tractor Co.* (1980), 80 Ill. App. 3d 262, 264, 399 N.E.2d 722, 723.) In our opinion neither party has addressed this issue squarely. We do not believe this is a straight installation instruction issue, as plaintiff would have it, because in this case the installation of ASF's product, the casting, involved the creation of a completely separate machine, the bolster press. While it is true that ASF did not manufacture the bolster press, it is clear that ASF played some role in Thrall's use of this method of installing ASF's castings. Our task is to determine how significant this role was and whether it gave rise to a duty to warn. Unfortunately, our research failed to produce any authority directly on point, but we find a recent decision by this court to be helpful.

In *Bittler v. Doyen & Associates, Inc.* (1995), 271 Ill. App. 3d 645, 648 N.E.2d 1028, the plaintiff was injured by a mobile vacuum unit that was purchased by Commonwealth Edison and manufactured by D.P. Way. Edison engaged Doyen & Associates, Inc., an engineering consultant, and provided Doyen with its specific requirements for the vacuum. Doyen's role was to produce final bid specifications under Edison's direction and evaluate bids received for their general conformance with the technical requirements of the specifications. Doyen approved the bids and turned them over to Edison. Edison was solely responsible for deciding which bid to accept, and it chose D.P. Way to design and manufacture the vacuum. Doyen did not recommend which bid to choose and did not inspect the final vacuum for conformance with the bid specifications compiled by Doyen.

The plaintiff argued that Doyen was responsible for the defective and unsafe design of the vacuum because it was manufactured in accordance with Doyen's compiled design specifications, which lacked necessary safety features. Essentially, the plaintiff was arguing "that the compilation of design specifications is tantamount to actually designing a product since the manufacturer's blueprints are prepared in accordance with those specifications." (*Doyen*, 271 Ill. App. 3d at 649, 648 N.E.2d at 1031.) The trial court granted summary judgment to Doyen under the theory of strict product liability and the plaintiff appealed. The issue decided by the appellate court was whether "an independent consultant retained by the ultimate purchaser of a product to compile design specifications for the sole purpose of soliciting bids for the manufacture of that product can be held strictly liable in tort." (*Doyen*, 271 Ill. App. 3d at 648, 648 N.E.2d at 1031.) The appellate court answered this specific question in the negative; however, the court's reasoning is equally applicable to the question presented by this case. The court stated:

> "We believe that the plaintiffs misinterpret the significance of specifications to the ultimate design of a product. The purpose of design specifications is to form the basis of the blueprints from which the product will be manufactured. They merely outline the general design elements mandated by the purchaser or user of the product. Therefore, in an indirect way, one who compiles specifications has a hand in the design of the product, but it would be disingenuous to label that party a co-designer. Contrary to the plaintiff's assertion, it does not logically follow that design of the end product is tantamount to design of the instrumentality for which the end product is made.
>
> Specifications are not intended as a substitute for a safe design and manufacture in accordance with the various safety statutes.

> While all requirements peculiar to the needs of the purchaser must be included in the specifications and therefore the blueprints for manufacture, it is the designer/manufacturer who is in the best position to determine if any safety features in addition to those listed in the specifications are necessary due to the inherently dangerous nature of the product." (Emphasis omitted.) (*Doyen*, 271 Ill. App. 3d at 649-50, 648 N.E.2d at 1031.)

The court also found persuasive the fact that the vacuum was not a custom design but was a previous design by D.P. Way. *Doyen*, 271 Ill. App. 3d at 650, 648 N.E.2d at 1031.

■ In this case, ASF only provided a drawing of the bolster press. According to plaintiff's own expert, Marvin Salzenstein, ASF's drawing was not a blueprint and the bolster press could not be manufactured using the drawing. Thrall manufactured the bolster press and was in the best position to determine if additional safety features were needed. Therefore, we hold that ASF's role in Thrall's use of the bolster press did not give rise to strict liability in tort, and we affirm the trial court's order barring plaintiff from presenting evidence regarding ASF's failure to warn of dangers associated with operating the bolster press. In so holding, we note that plaintiff was not barred from arguing that ASF's friction castings were unreasonably dangerous because they were sold without warning that fragments could be broken loose during installation.

■ Plaintiff next contends that the trial court erred by barring plaintiff from making reference during closing argument to metal burrs, fins, flashings or other surface irregularities on the friction casting involved in the incident. According to plaintiff, this ruling precluded him from presenting his theory of causation to the jury. However, we find that plaintiff exaggerates the significance of the court's ruling because he was allowed to argue that the fragment came from the casting.

Plaintiff argues that he presented sufficient evidence from which the jury could have reasonably inferred that the accident occurred when an irregularity on the surface of the friction casting caused it to become hung up during installation. There is evidence that the presence of fins would impede the installation of the casting. Mr. Holliday testified that the friction castings delivered in 1986 had a buildup at the seams, like a fin or scaling, but he never saw the casting that Mr. Harding was installing. Plaintiff presented no evidence to show that surface irregularities existed on the friction casting David Harding was installing at the time he was injured. A jury's verdict cannot be based upon mere speculation. (*Stafford v. Borden* (1993), 252 Ill. App. 3d 254, 259, 625 N.E.2d 12, 16.) Therefore, the circuit court's ruling properly confined plaintiff's counsel to his proof.

■ The next issue is whether the trial court erred in barring plaintiff's expert from relying on ASF's specifications to show that the energy required to install the friction castings was 300 foot-pounds. Marvin Salzenstein testified during his deposition that he had not made any calculations relating to the force necessary to fracture a piece from the casting. At the deposition of Peter Barroso, ASF's spring specifications were made an exhibit. Two days before trial, plaintiff's counsel sent a letter to defense counsel advising him that plaintiff's experts would be reviewing Peter Barroso's deposition. At trial, plaintiff sought to introduce the testimony of Mr. Salzenstein regarding the precise amount of force needed to fracture a piece of casting based on the exhibit introduced during Mr. Barroso's deposition. The trial court properly barred the testimony under Supreme Court Rule 220 (134 Ill. 2d R. 220).

Rule 220(d) states that an expert's testimony "may not be inconsistent with or go beyond the fair scope of the facts known or opinions disclosed" in discovery proceedings. (134 Ill. 2d R. 220(d).) Plaintiff cites a recent Illinois Supreme Court decision where the court stated that Rule 220 does not establish "an inflexible and draconian framework." (*Sohaey v. Van Cura* (1994), 158 Ill. 2d 375, 381, 634 N.E.2d 707, 709.) However, *Sohaey* is not on point. Not only are the facts distinguishable, but the court is interpreting section (b) of Rule 220, not section (d). In *Sohaey*, the plaintiffs disclosed their original expert in a timely fashion and that expert was deemed competent to testify by the trial judge. A successor judge later granted the defendant's motion *in limine* to bar the expert's testimony four days prior to the trial date. A new trial date was set and plaintiffs disclosed a new expert 63 days before that date. A month before the trial, the trial court barred this new expert under Rule 220(b) because plaintiffs did not disclose the expert before the original cut-off date set by the court. The supreme court held that this result was "utterly antithetical to the purpose and intent of Rule 220." *Sohaey*, 158 Ill. 2d at 382, 634 N.E.2d at 710.

In *Sohaey*, the plaintiffs were prohibited from presenting any expert testimony simply because the successor judge found their first expert incompetent after the cut-off date for disclosing experts. In this case, plaintiff's expert was only prohibited from relying on data that would have expanded his testimony beyond the opinions disclosed during his deposition, which is the result Rule 220(d) mandates. The result is far from draconian in this case, and the trial court did not abuse its discretion by barring this testimony.

■ Plaintiff's next contention is that the circuit court erred in denying plaintiff's motion to bar the testimony of Dr. Fred Litooy,

ASF's medical expert. Plaintiff moved to bar Dr. Litooy from testifying as a sanction for the conduct of ASF's counsel. Apparently, ASF's counsel engaged in *ex parte* contacts with Dr. Richard Caleel, one of plaintiff's treating physicians. In *Petrillo v. Syntex Laboratories, Inc.* (1986), 148 Ill. App. 3d 581, 610, 499 N.E.2d 952, the court held that "discussions between defense counsel and a plaintiff's treating physician should be pursuant to the rules of discovery only." Dr. Caleel was expected to testify that the surgery he performed on plaintiff's varicose veins was not related to his leg injury. The circuit court barred the testimony of Dr. Caleel, which would have supported ASF's case on the issue of damages. This was an appropriate sanction under the circumstances. Thus, the trial court did not err in denying plaintiff's motion regarding Dr. Litooy.

■ Plaintiff's next contention is that the trial court erred in instructing the jury on three occasions. It is well within the trial court's discretion to determine which instructions shall be given, and the exercise of such discretion will not be disturbed by the reviewing court in the absence of an abuse of discretion. (*Kramer v. Milner* (1994), 265 Ill. App. 3d 875, 879, 639 N.E.2d 157, 160.) Plaintiff first argues that the court should have given plaintiff's issues instruction that irregularities on the surface of the friction casting propelled a steel fragment from the casting. As discussed earlier, plaintiff was unable to establish that an irregularity existed on the casting being installed at the time plaintiff was injured. Therefore, the trial court properly declined to give the proposed instruction.

Second, plaintiff contends that the trial court should have given plaintiff's non-Illinois Pattern Jury Instruction on the aggravation of a preexisting condition. Plaintiff's proposed jury instruction pertained to damages. "It is well established that where a defendant is found not liable, alleged [instructional] errors pertaining solely to the question of damages do not afford grounds for reversal." *Schuchman v. Stackable* (1990), 198 Ill. App. 3d 209, 231, 555 N.E.2d 1012, 1026.

Third, plaintiff contends that the trial court should have given the long form instruction on proximate cause. The comments to the Illinois Pattern Jury Instructions on proximate cause state that the long form should be given if there is a contributing or concurrent cause to the injury. (Illinois Pattern Jury Instructions, Civil, No. 15.01 (2d ed. 1971).) Plaintiff argues that the "failure to give the long form *** may have led the jury to believe that if plaintiff's knee condition was caused in part by his pre-existing condition, then the injury sustained on June 30, 1986 was not a proximate cause of his surgeries." Plaintiff is confusing the concepts of proximate cause and preexisting medical condition. The preexisting medical condition was

relevant only to plaintiff's damages and not to the issue of proximate cause in this case. Therefore, the trial court's ruling was proper.

■ The final issue we address is whether the trial court erred in denying plaintiff's motion for leave to file a second-amended complaint following the return of the jury's verdict. Section 2—616(c) of the Code of Civil Procedure provides that pleadings "may be amended at any time, before or after judgment, to conform the pleadings to the proofs." (735 ILCS 5/2—616(c) (West 1992).) However, in order to allow the amendment of a pleading to conform to proof, the proof already produced must support the amendment. (*Bank of Illinois v. Thweatt* (1994), 258 Ill. App. 3d 349, 355, 630 N.E.2d 121, 125-26.) A trial court decision to deny leave to file an amended complaint will not be disturbed absent a clear abuse of discretion. *Canning v. Barton* (1994), 264 Ill. App. 3d 952, 957, 637 N.E.2d 702, 705.

Plaintiff sought leave to file an amended complaint to "particularize his allegations relating to the presence of an irregularity on the friction casting and defendant's failure to warn of the dangers of operating the bolster press." As determined above, the evidence presented at trial does not support these allegations. Therefore, the trial court's denial of plaintiff's motion was not an abuse of discretion.

For all of the foregoing reasons, we affirm the judgment in favor of ASF. In light of our holding, we need not address plaintiff's remaining contentions, which pertain to damages. In particular, we find that the issue of whether ASF is entitled to a setoff in the amount paid to plaintiff by Thrall under the Workers' Compensation Act (820 ILCS 305/1 *et seq.* (West 1992)) is moot.

Affirmed.

CAMPBELL, P.J., and BRADEN, J., concur.