2017 IL App (1st) 162808

No. 1-16-2808

Fourth Division
December 7, 2017

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

|  |  |  |
|---|---|---|
| INSURANCE BENEFIT GROUP, INC., | ) | |
| | ) | |
| | ) | Appeal from the Circuit Court |
| Plaintiff-Appellee and Cross-Appellant, | ) | of Cook County. |
| | ) | |
| v. | ) | No. 11 CH 28150 |
| | ) | |
| GUARANTEE TRUST LIFE INSURANCE | ) | The Honorable |
| COMPANY, | ) | Margaret Ann Brennan, |
| | ) | Judge Presiding. |
| Defendant-Appellant and Cross-Appellee. | ) | |
| | ) | |

_____

JUSTICE GORDON delivered the judgment of the court, with opinion.
Presiding Justice Burke and Justice McBride concurred in the judgment and opinion.

**OPINION**

¶ 1     Plaintiff Insurance Benefit Group, Inc., filed suit against defendant Guarantee Trust Life Insurance Company for violation of a marketing agreement. The matter proceeded to a bench trial on counts III and V of the complaint, and the trial court entered judgment in plaintiff's favor on one part of count III; it entered judgment in defendant's favor on the remainder of count III and on count V. Defendant appeals, arguing that the trial court should have found in defendant's favor on the entirety of count III. Plaintiff cross-appeals, arguing that the trial court should have found in its favor on the entirety of count III and that the trial court erred

in finding in defendant's favor on count V and in denying plaintiff leave to file a second amended complaint. For the reasons that follow, we affirm.

¶ 2                                     BACKGROUND

¶ 3                                     I. Complaint

¶ 4                              A. Allegations of Complaint

¶ 5        On August 10, 2011, plaintiff filed a five-count complaint against defendant; the complaint was subsequently amended, and it is the first amended complaint that proceeded to trial. Counts III and V of the first amended complaint were the only counts at issue at trial, and plaintiff does not raise any arguments concerning any other counts.[1] Accordingly, we discuss only the two relevant counts of the first amended complaint.

¶ 6        Count III of the first amended complaint was for breach of a written contract and alleged that defendant sold various insurance products, including health insurance products, within the state of Illinois. In the course of this business, defendant had entered into a reinsurance agreement with Munich Reinsurance America, Inc. (Munich). In October or November 2007, Montgomery Edson, on behalf of defendant, approached Richard Hayes, plaintiff's president and chief executive officer, to determine whether plaintiff would be interested in developing and marketing certain of defendant's health insurance programs. After discussions between Edson and Hayes, on December 1, 2007, plaintiff and defendant executed a marketing agreement under which plaintiff agreed, among other things, to become the exclusive marketer of certain of defendant's insurance products. In January 2008, based on plaintiff's

---

[1]Counts I and II were voluntarily dismissed by plaintiff, while count IV was dismissed by the trial court pursuant to section 2-619 of the Code of Civil Procedure (735 ILCS 5/2-619 (West 2010)).

agreement to become defendant's exclusive marketer under the marketing agreement, Munich extended its reinsurance agreement with defendant for one year.

¶ 7    Under the terms of the marketing agreement, defendant authorized and appointed plaintiff as defendant's exclusive marketer for various insurance programs offering health insurance policies within the territories listed in the marketing agreement, including 40 states within the United States. The size of the territory set forth in the marketing agreement "was a material consideration" for plaintiff entering into the marketing agreement.

¶ 8    Additionally, under the terms of the marketing agreement, "[defendant] agreed to pay [plaintiff] certain commissions," consisting of:

"(a) Three percent (3%) of all premiums collected regardless of who sold the product;

(b) The allowable producer commission *** as set forth in the reinsurance treaty ***."

On August 1, 2009, plaintiff and defendant entered into an amendment of the marketing agreement which, among other things, amended the calculation of the producer commission, which had previously been calculated by reference to the reinsurance agreement with Munich. According to the complaint, "[t]he payment of commissions on both the original sale of a health insurance policy as well as the renewal thereof was a material consideration" for plaintiff entering into the marketing agreement.

¶ 9    The complaint alleged that sometime in July 2009, defendant began to discontinue certain health insurance programs that fell within the terms of the marketing agreement and replace them with others that defendant claimed did not fall within the terms of the marketing agreement. Hayes advised Edson that plaintiff objected to the replacement of these policies.

On January 1, 2010, defendant terminated the marketing agreement. The complaint alleged that the purpose for terminating the marketing agreement "was to avoid paying [plaintiff] the three percent (3%) commission and Producer Commissions rightfully due" plaintiff.

¶ 10        Count III alleged that defendant breached the express terms of the marketing agreement by (1) failing to maintain authority to sell certain insurance products in states that were part of plaintiff's territory, (2) discontinuing insurance policies that fell within the terms of the marketing agreement and replacing them with policies that defendant claimed did not fall within the terms of the marketing agreement, (3) failing to pay plaintiff the 3% commissions due to plaintiff on policies already sold, (4) failing to pay plaintiff all of the producer commissions due to plaintiff, and (5) terminating the marketing agreement in violation of the terms of the marketing agreement. At trial, the focus was solely on the payment of two fees allegedly owed to plaintiff.

¶ 11        Count V of the first amended complaint was for breach of an oral agreement and alleged that in spring 2008, plaintiff determined that defendant was selling products in states in which defendant had not received approval to sell. According to the complaint, "[t]he products that were being sold without having been approved for such sale did not fall within the terms of the Marketing Agreement and [plaintiff] was not receiving any commissions for their sale." When Hayes discovered that defendant was not approved to sell products in certain states, he advised Edson that defendant needed to obtain approvals in the states in which defendant was not in compliance. According to the complaint, "[w]ithout Richard Hayes' original knowledge, Al Heindal, [defendant's] Compliance and Licensing Officer,

asked Karen Marcozzi, an employee of [plaintiff],[2] to assist [defendant] in obtaining such approvals."

¶ 12      When Hayes discovered that Marcozzi "was performing tasks which were not [plaintiff's] responsibility under the Marketing Agreement," Hayes advised Edson "that because it was not [plaintiff's] responsibility under the Marketing Agreement to perform compliance work on products which were not governed under the terms of the Marketing Agreement and for which [plaintiff] was not being paid commissions, [plaintiff] would not allow Karen Marcozzi to continue to work with [defendant] on those efforts." In response, Edson offered to Hayes "that if [plaintiff] would continue to allow Karen Marcozzi to assist [defendant] in seeking compliance for insurance products that were not governed by the terms of the Marketing Agreement and for which [plaintiff] was not being paid commissions, [defendant] would pay [plaintiff] for Karen Marcozzi's services at Karen Marcozzi's billing rate of $50.00 per hour." Hayes accepted this offer on behalf of plaintiff, and Marcozzi continued to assist defendant in obtaining state approval for sale of the products. However, in breach of the oral agreement, defendant refused to pay plaintiff for the time and expenses incurred by Marcozzi.

¶ 13                              B. Marketing Agreement

¶ 14      Attached to the complaint was a copy of the marketing agreement. Article III of the marketing agreement was entitled "Marketer's Compensation" and provided, in relevant part:

> "A. [Defendant] will pay Marketer, as full compensation for all duties and responsibilities under this Agreement, the amounts set forth in Exhibit A. Compensation will be paid to you based on Policies produced by you and your

---

[2]According to the record, Marcozzi's duties included regulatory compliance administration, meaning that she ensured that the policies plaintiff procured met state regulatory requirements.

Producers. Any commission payable will be made on at least a monthly basis and only after the receipt of premium by [defendant] for such Policy. Marketer shall refund to [defendant] any compensation received on cancellations, refunds and return premiums for such Policies.

B. Unless this Agreement is terminated for 'cause' as described below, your first year and renewal year commission are vested."

¶ 15    The marketing agreement also contained an integration clause, which provided:

"*Entire Agreement*. This Agreement supersedes all previous agreements, whether written or oral, between [defendant] and Marketer, or their predecessors with respect to the Business to be written under this Agreement.

1. This Agreement may be amended, altered or modified only in writing signed by both parties.

2. Manuals, rules, regulations, guidelines, instructions and directions issued in writing by [defendant] from time to time as provided in this Agreement, shall bind the Marketer as though a part of this Agreement."

¶ 16    Exhibit A to the marketing agreement, as amended,[3] provided, in relevant part:

"Compensation:

Marketer's Fee: For all Policies/certificates issued on or after 12/1/07, Marketer will receive 3% of all premiums collected by [defendant's] third party administrator for such Policies/certificates, less any returns or refunded premium amounts.

---

[3]The compensation due plaintiff under the preamended version of Exhibit A is not at issue on appeal.

Commissions:[4] For the GTL Forms identified below, [plaintiff] will receive a commission on all base premium collected (no underwriting rate-up and no rate increase premium) by [defendant's] third party administrator for all Policies/Certificates issues, less any returns or refunded premium amounts. The commission rate shall be: 32% for policy/cert year 1; 10% for policy/cert year 2; and 8% thereafter as long as the policy/cert remains in force. These commission amounts do not apply to any replacement policies issued within 12 months of the original policy's termination date or as a result of [defendant's] Uniform Termination of Coverage program under HIPAA."

¶ 17                                    II. Trial

¶ 18        At trial, Richard Hayes testified on behalf of plaintiff[5] that he was plaintiff's[6] chief executive officer and sole shareholder. He signed the marketing agreement on behalf of plaintiff, and Montgomery Edson signed it on behalf of defendant. Hayes was given the marketing agreement on the stand, and testified to his understanding of certain terms within the agreement. He testified that his understanding of the word "vested" based on his extensive experience in the insurance industry was that "your rights to compensation cannot be taken away from you, at any time, except for cause. And those commissions and compensations will go on and on and on, according to your agreement, and can't be taken

---

[4]This provision was formerly entitled "Producer Commission" under the preamended Exhibit A. While the name has changed, the parties and the trial court continued to refer to it as the producer commission, and we will do the same.

[5]We note that in its brief on appeal, defendant states that plaintiff called Hayes "as its sole witness." However, as related later in this opinion, plaintiff in fact also called two of defendant's employees as adverse witnesses. Defendant does not discuss the testimony of these witnesses in its brief.

[6]Hayes testified that plaintiff changed its name and was now named Integra Benefits.

away from you, basically." Hayes testified that "[t]he only time commissions would terminate is when the policyholder stops being a policyholder and stops paying his premiums." With respect to the marketer's fee, Hayes testified that it was not a one-time fee but was a continuing payment. Hayes testified that the difference between the marketer's fee and the producer's commission was that "one is level, like the 3 percent goes on and on and on, it doesn't go down. Where the producer's commission is different is because it starts at a level higher and then it goes down to where it's a level renewal commission."

¶ 19    Hayes testified that the marketing agreement was terminated effective January 1, 2010, as demonstrated by a letter drafted by Rob Baluk, legal counsel for defendant. At the time of the termination, there were still policies in effect that had been procured by plaintiff pursuant to the marketing agreement.

¶ 20    Hayes testified that Gilsbar, L.L.C. (Gilsbar), was defendant's third-party administrator for the policies that plaintiff procured for defendant. Gilsbar remained the third-party administrator after the marketing agreement was terminated, and plaintiff continued to be paid for those policies after the termination in 2010.

¶ 21    Hayes testified that Karen Marcozzi was an employee of plaintiff's from 2007 through 2010, and her duties consisted of regulatory compliance administration, meaning that she ensured that the policies plaintiff procured pursuant to the marketing agreement met state regulatory requirements. Marcozzi also performed compliance work for policies that were not procured by plaintiff; Hayes testified that it came to his attention that she had been performing compliance work on some of defendant's policies that predated the marketing agreement. In March or April 2008, Hayes had a telephone call with Edson about the issue, followed by a meeting in June or July. The telephone call also included Al Heindl,

defendant's compliance officer. During the in-person meeting with Edson, "[w]e talked about Karen helping them in the prior block of business to make sure that they—regulatory and the compliance was happening so they wouldn't get in trouble. And we agreed that Karen would receive $50 an hour, keep track of her work and then when the projects were all done, we would get reimbursed." Hayes identified a document shown to him as "the records that Karen kept as she was doing the work and it's the hours, the type of work she did and the totals for the [nonmarketing agreement] work that she was performing." Hayes testified that her hours were kept under his direction and control and that "[s]he would perform the duties, put the hours and then communicate with me, on a frequent basis, what she was doing." Once the document was prepared, Hayes gave it to Edson.

¶ 22    Plaintiff then moved to admit the document into evidence, and defendant objected. In response, plaintiff offered a "Certification Pursuant to Rule 902(11) of the Illinois Rules of Evidence"[7] prepared by Marcozzi. The memorandum reflecting the number of hours she spent on such services to be submitted to defendant was attached as exhibit A to her certification and reflected that she had spent 1463.5 hours performing the nonmarketing agreement services.

¶ 23    Additionally, Marcozzi stated in her certification that she was authorized to retain the services of Suzanne Heasley as an independent contractor to assist her in performing the

---

[7]Rule 902(11) provides that "[e]xtrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to *** [t]he original or a duplicate of a record of regularly conducted activity that would be admissible under Rule 803(6) if accompanied by a written certification of its custodian or other qualified person." Ill. R. Evid. 902(11) (eff. Jan. 1, 2011). The certification must be a written declaration under oath subject to the penalty of perjury and must certify that the record "was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of these matters"; "was kept in the course of the regularly conducted activity"; and "was made by the regularly conducted activity as a regular practice." Ill. R. Evid. 902(11) (eff. Jan. 1, 2011).

nonmarketing agreement services for defendant. Heasley submitted a total of $9233.88 in bills to plaintiff, which plaintiff paid; these bills were also reflected in the memorandum prepared by Marcozzi.

¶ 24     Based on Marcozzi's certification, the document was admitted into evidence. Following its admission Hayes testified that plaintiff did not receive any payment from defendant for the nonmarketing agreement services that Marcozzi had performed.

¶ 25     On cross-examination, Hayes admitted that the marketing agreement provided that "commissions" were vested and did not specify that the marketing fee was vested; he further admitted that the marketing fee and producer's commission were separated into two provisions in the marketing agreement. Hayes also testified that after May 2011, no third-party administrator collected any premiums. Hayes testified that plaintiff would not be entitled to any producer's commissions on policies that were replaced by replacement policies or for policies that were terminated. As to Marcozzi's work, Hayes testified on cross-examination that he and Edson did not set a specific date for her contract to begin or end, and did not specify the length of the contract.

¶ 26     Robert Baluk testified both as an adverse witness on behalf of plaintiff and as a witness on behalf of defendant that he was defendant's general counsel and was involved in the drafting of the marketing agreement and its amendment. Baluk testified that after the January 1, 2010, termination date of the marketing agreement, defendant did not issue any health insurance policies that were subject to the marketing agreement but issued other health insurance policies using different forms. Baluk further testified that after the termination of the marketing agreement, plaintiff continued to be paid for any commissions it was owed through October 2010. However, plaintiff was not paid commissions on any premiums

collected by defendant after May 2011, when Gilsbar stopped being the third-party administrator.

¶ 27    Baluk testified that Montgomery Edson was a senior vice president of marketing for defendant and was in charge of defendant's "fronting programs." Baluk explained that under those programs, defendant "would pretty much take a small percentage of the risk, around 10 percent usually, and then we'd farm out the administration to a third-party administrator. The marketing would be done by a marketer outside the company. And then the reinsurer would pick up 90 percent of all the costs as well as 90 percent of all the profits. We just received a small percentage of the risk and we received a small fee for allowing these other parties to basically sell our products." Plaintiff was the marketer for one of these programs, and Gilsbar was the third-party administrator. Baluk testified that defendant was very structured in terms of agreements executed pursuant to these types of programs because there were many entities and contracts involved.

¶ 28    Baluk testified that plaintiff would only be entitled to the marketer's fee so long as there was a third-party administrator collecting the premium and, if there was no third-party administrator, no fee would be owed. He further testified:

> "Q. So under that scenario, as a hypothetical, [plaintiff] could have procured a thousand policies the first month and a third-party administrator would be there to administer them. The second month [defendant] could say, you know what, why are we paying these fees? Let's just terminate the third-party administrator and keep the fees yourself. Is that your position?
>
> A. I'm not sure I heard a question there. Keep in mind, as I testified earlier, the fronting programs were structured so there were multiple outside parties outside of

[defendant] that performed specific functions. That's the way the fronting programs worked. We weren't able to administer or *** do a lot of these things internally ourselves, so it would be unlikely that scenario would happen.

Q. But if it did happen, would it be your position that there be no compensation?

A. The program would no longer be in place, so yes."

Baluk testified that "[t]here were no policies remaining when the third-party administrator was terminated" and that "[t]hey were either cancelled through uniform termination of coverage or discontinuance of all coverage."

¶ 29    Barbara Sloothaak testified both as an adverse witness on behalf of plaintiff and as a witness on behalf of defendant that she was defendant's controller and, as such, oversaw all of defendant's financial reporting. Sloothaak testified that a document compiling policies that defendant self-administered beginning in 2011 showed that defendant collected a total of $1,680,779.90 in premiums. Sloothaak further testified that all of these policies were a different type of policy than that marketed by plaintiff and that they all had different policy numbers than plaintiff's policies.[8]

¶ 30    On September 23, 2016, the trial court issued a memorandum decision and judgment, in which it found that Marcozzi's certification "contained an after the fact compilation of estimated hours for the work performed. Due to the bills not being created concurrent with the work performed and the estimated nature of the bills, the court can afford little if any weight to the bills submitted." The court also found that "Robert Baluk established that the Marketing Fee ceased once the Amended Marketing Agreement took effect. As such the

---

[8]Kim Prevost, a business analyst at Gilsbar, testified via evidence deposition as to certain records. However, the evidence deposition does not appear in the record on appeal.

evidence supports [defendant's] contention that no amount is owed for a breach of the Marketing Agreement with regards to the Marketing Fee." The court further found that "Robert Baluk asserted that once [defendant] took over administering the policies, as no [third-party administrator] was involved, then no Producers Commission would be owed to [plaintiff]. This is an absurd reading of the contract." The court found that the producer commission owed to plaintiff was $134,460, based on a producer commission of 8%.

¶ 31     The court made the following findings of fact and conclusions of law concerning the fees owed under the marketing agreement:

> "The evidence clearly established Gilsbar was no longer the [third-party administrator] after May 31, 2011. As such, [plaintiff] has not proved that [defendant] breached the contract with regards to the Marketing Fee.
>
> Concerning the Producers Commission, [plaintiff] must establish that [defendant] failed to pay the Producers Commission on renewal policies. [Plaintiff] established through the testimony of Kim Prevost that certain policies were cancel and replace policies and therefore no commission would be owed on those policies. As to the remaining policies, the evidence supports that premiums in the amount of $1,680,779 and therefore an 8% commission would be owed. Baluk's and Sloothak's claims that all the policies were cancel and replace or UTC policies lacked any documentary support and therefore strained all credibility with the Court. Additionally this Court finds the claim that by bringing the work and attendant cost of administering policies into [defendant], rather than using a [third-party administrator], somehow justified cutting the fee to marketer absurd. Therefore, [plaintiff] has met its burden as to the Producers Commission and will be awarded $134,460 on Count II [*sic*]."

13

¶ 32    With respect to count V, which concerned payment for Marcozzi's work, the court found:

"Concerning Count V, the oral contract for Karen Marcozzi's services, [plaintiff] has failed to meet its burden of proof as to that claim. *** The evidence overwhelmingly established that compliance work was contracted for as part of [the] Marketing Agreement, and there was no separate oral contract formed. *** If a modification to the time frame was to be done, then the integration clause in the Marketing Agreement required a writing. Additionally, no subcontractor was ever contemplated in the Marketing Agreement, so there is zero support for those fees. Lastly, the Court afforded very little weight to the fees of Karen Marcozzi as the 'bill' was an estimate of time spent, created long after the work was performed. Therefore, judgment is entered in favor of [defendant] on Count V."

¶ 33    Defendant filed a notice of appeal, and plaintiff filed a notice of cross-appeal.

¶ 34                                ANALYSIS

¶ 35    On appeal, each party argues that the trial court should have entered judgment entirely in its favor on count III, and plaintiff argues that the trial court should have entered judgment in its favor on count V. Plaintiff also argues that the trial court should have permitted it leave to file a second amended complaint.

¶ 36                                I. Count III

¶ 37    First, each party argues that the trial court should have entered judgment entirely in its favor on count III—defendant argues that the trial court should not have awarded plaintiff the producer commission, while plaintiff argues that it was also entitled to the marketing fee. "Generally, the standard of review in a bench trial is whether the order or judgment is against the manifest weight of the evidence." *Reliable Fire Equipment Co. v. Arredondo*, 2011 IL

14

111871, ¶ 12. "[W]here findings of fact depend on the credibility of witnesses, it is particularly true that a reviewing court will defer to the findings of the trial court unless they are against the manifest weight of the evidence." *Eychaner v. Gross*, 202 Ill. 2d 228, 251 (2002). "A decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence. [Citations.] 'The court on review must not substitute its judgment for that of the trier of fact.' " *Eychaner*, 202 Ill. 2d at 252 (quoting *Kalata v. Anheuser-Busch Cos.*, 144 Ill. 2d 425, 434 (1991)). However, the trial also concerned the construction and interpretation of contractual terms. "The interpretation of a contract involves a question of law, which we review *de novo*." *Carr v. Gateway, Inc.*, 241 Ill. 2d 15, 20 (2011). *De novo* consideration means we perform the same analysis that a trial judge would perform. *People v. McDonald*, 2016 IL 118882, ¶ 32.

¶ 38        "In construing a contract, the primary objective is to give effect to the intention of the parties." *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011) (citing *Gallagher v. Lenart*, 226 Ill. 2d 208, 232 (2007)). The court will first look to the language of the contract itself to determine the parties' intent, and the contract must be construed as a whole, "viewing each provision in light of the other provisions." *Thompson*, 241 Ill. 2d at 441. "The parties' intent is not determined by viewing a clause or provision in isolation, or in looking at detached portions of the contract." *Thompson*, 241 Ill. 2d at 441. "If the words in the contract are clear and unambiguous, they must be given their plain, ordinary and popular meaning." *Thompson*, 241 Ill. 2d at 441 (citing *Central Illinois Light Co. v. Home Insurance Co.*, 213 Ill. 2d 141, 153 (2004)). "A court will not interpret a contract in a manner that would nullify or render provisions meaningless, or in a way that is contrary to the plain and obvious meaning of the

language used. [Citation.] Further, when parties agree to and insert language into a contract, it is presumed that it was done purposefully, so that the language employed is to be given effect. [Citation.]" *Thompson*, 241 Ill. 2d at 442.

¶ 39    Compensation under the marketing agreement was governed by article III, which provided, in relevant part:

"A. [Defendant] will pay Marketer, as full compensation for all duties and responsibilities under this Agreement, the amounts set forth in Exhibit A. Compensation will be paid to you based on Policies produced by you and your Producers. Any commission payable will be made on at least a monthly basis and only after the receipt of premium by [defendant] for such Policy. Marketer shall refund to [defendant] any compensation received on cancellations, refunds and return premiums for such Policies.

B. Unless this Agreement is terminated for 'cause' as described below, your first year and renewal year commission are vested."

Exhibit A, in turn, provided, in relevant part:

"Compensation:

Marketer's Fee: For all Policies/certificates issued on or after 12/1/07, Marketer will receive 3% of all premiums collected by [defendant's] third party administrator for such Policies/certificates, less any returns or refunded premium amounts.

Commissions: For the GTL Forms identified below, [plaintiff] will receive a commission on all base premium collected (no underwriting rate-up and no rate increase premium) by [defendant's] third party administrator for all Policies/Certificates issues, less any returns or refunded premium amounts. The

16

commission rate shall be: 32% for policy/cert year 1; 10% for policy/cert year 2; and 8% thereafter as long as the policy/cert remains in force. These commission amounts do not apply to any replacement policies issued within 12 months of the original policy's termination date or as a result of [defendant's] Uniform Termination of Coverage program under HIPAA."

¶ 40    In the case at bar, the parties focus on what they call the trial court's inconsistent readings of the marketer's fee and producer commission. Specifically, both provisions refer to premiums "collected by [defendant's] third party administrator," but the trial court found that plaintiff was entitled to one and not the other. However, we cannot agree that the trial court's interpretation of the marketing agreement was inconsistent given the other important distinction between the provisions—namely, that, as a commission, the producer commission was vested while the marketing fee was not.

¶ 41    First, with respect to the marketing fee, as noted, the marketing agreement provided that, "[f]or all Policies/certificates issued on or after 12/1/07, Marketer will receive 3% of all premiums collected by [defendant's] third party administrator for such Policies/certificates, less any returns or refunded premium amounts." It is undisputed that defendant self-administered its policies after May 31, 2011. Under the plain language of the provision, then, because there were no "premiums collected by [defendant's] third party administrator," there was no marketing fee due. We cannot find that the trial court erred in reaching this conclusion.

¶ 42    The analysis becomes slightly more complex, however, when taking the producer commission into account. The marketing agreement provided that "[plaintiff] will receive a commission on all base premium collected (no underwriting rate-up and no rate increase

premium) by [defendant's] third party administrator for all Policies/Certificates issues, less any returns or refunded premium amounts. The commission rate shall be: 32% for policy/cert year 1; 10% for policy/cert year 2; and 8% thereafter as long as the policy/cert remains in force." At first glance, the same analysis would apply as with the marketer's fee—because there was no "premium collected *** by [defendant's] third party administrator," plaintiff would not be entitled to compensation under this provision. Indeed, this is the way that defendant urges us to read this provision. However, we cannot do as defendant wishes and merely view the phrase "premium collected *** by [defendant's] third party administrator" in isolation, because "[t]he parties' intent is not determined by viewing a clause or provision in isolation, or in looking at detached portions of the contract." *Thompson*, 241 Ill. 2d at 441. In the case at bar, the producer commission is labeled as a "commission" and, under the express terms of the marketing agreement, "your first year and renewal year commission are vested." Thus, if we simply interpreted provisions the same way, plaintiff would cease to be entitled to its commission once defendant decided to self-administer the policies, rendering the vesting provision meaningless. See *Thompson*, 241 Ill. 2d at 442 ("A court will not interpret a contract in a manner that would nullify or render provisions meaningless, or in a way that is contrary to the plain and obvious meaning of the language used."). The only way to read the vesting provision and the producer commission provision in harmony is to find that the producer commission remains in effect even after the third-party administrator has ceased administrating the policies. We also note that all of the policies for which plaintiff seeks commissions would be renewal policies, as opposed to new policies. Thus, all of these policies had premiums that had at one time been collected by the third-party administrator, even if they were now being self-administered.

¶ 43        We are unpersuaded by plaintiff's attempt to read the marketing agreement's vesting language as applying to the marketer's fee. The marketer's fee is labeled a "fee" and not a "commission." This is not a distinction without a difference because the marketing agreement expressly gives commissions special treatment by providing that they are vested. Furthermore, the parties clearly drew a distinction between a fee and a commission by choosing to use both terms in separate provisions of exhibit A. They did so not only in the original marketing agreement but also amended the agreement upon the termination of the reinsurance agreement and again included the two distinct terms. There is simply no basis for treating the marketer's fee as though it was a commission. Accordingly, we cannot find that the trial court erred in finding that plaintiff was entitled to the producer commission but not the marketer's fee.

¶ 44        As a final matter, we note that, at oral argument, defendant made several comments challenging the evidence presented at trial concerning the amount of plaintiff's damages. Defendant raised this issue for the first time on appeal in its reply brief, where the argument consisted of two brief paragraphs with no citations to authority and merely the claim that "there is simply no evidentiary support for" the trial court's findings of fact as to the damages calculations. Defendant also stated that "it is impossible to recite the entire transcript of proceedings in this brief to prove this assertion" and "instead challenge[d] counsel for [plaintiff] to pinpoint and quote the evidence in the record that supports these two findings of fact." Leaving aside the fact that the appellee does not respond to arguments made in a reply brief and therefore plaintiff would have no opportunity to meet defendant's "challenge," defendant, as the appellant, bears the burden of persuasion as to its claims of error. *City of Chicago v. Janssen Pharmaceuticals, Inc.*, 2017 IL App (1st) 150870, ¶ 29; *Yamnitz v.*

*William J. Diestelhorst Co.*, 251 Ill. App. 3d 244, 250 (1993). Furthermore, it is well settled that "[p]oints not argued [in the appellant's brief] are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016). Finally, during oral argument, defendant several times referenced the evidence deposition of Kim Prevost in support of this argument. However, as noted, the evidence deposition is not included in the record on appeal, but only in the appendix to defendant's brief on appeal. "[A]n appellant has the burden to present a sufficiently complete record of the proceedings at trial to support a claim of error, and in the absence of such a record on appeal, it will be presumed that the order entered by the trial court was in conformity with law and had a sufficient factual basis." *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). See also *Pine Top Receivables of Illinois, LLC v. Transfercom, Ltd.*, 2017 IL App (1st) 161781, ¶ 2 n.1 ("because including a document not a part of the record in an appendix is improper, we will not consider this document"); *Oruta v. B.E.W.*, 2016 IL App (1st) 152735, ¶ 32 ("This appendix also includes documents that are not in the appellate record and thus must be disregarded."); *People v. Wright*, 2013 IL App (1st) 103232, ¶ 38 ("The inclusion of evidence in an appendix is an improper supplementation of the record with information *dehors* the record."). Accordingly, we will not review defendant's claims as to any inadequacy of the proof of damages.

¶ 45                                    II. Count V

¶ 46        Plaintiff also argues that the trial court erred in finding in defendant's favor with respect to the oral contract for Marcozzi's work. "Oral agreements are binding so long as there is an offer, an acceptance, and a meeting of the minds as to the terms of the agreement." *K4 Enterprises, Inc. v. Grater, Inc.*, 394 Ill. App. 3d 307, 313 (2009). "The existence of an oral

contract, its terms, and the intent of the parties are questions of fact, and the trial court's determinations on those questions will be disturbed only if they are against the manifest weight of the evidence." *Anderson v. Kohler*, 397 Ill. App. 3d 773, 785 (2009).

¶ 47     In the case at bar, the trial court found that "[t]he evidence overwhelmingly establishes that compliance work was contracted for as part of [the] Marketing Agreement, and there was no separate oral contract formed." We cannot find that this conclusion was against the manifest weight of the evidence. The marketing agreement provided, as part of plaintiff's duties, that plaintiff would "file and secure approval of all policy, certificate, application and related forms" and "assure that the policies, certificates and related forms comply with all applicable state and federal laws, and regulations." The marketing agreement also contained an integration clause providing that "[t]his Agreement may be amended, altered or modified only in writing signed by both parties." Thus, we cannot find that it was against the manifest weight of the evidence for the trial court to find that any oral discussions about Marcozzi's work did not constitute a separate oral contract.

¶ 48     Furthermore, "[d]amages are an essential element of a breach of contract action and a claimant's failure to prove damages entitles the defendant to judgment as a matter of law." *In re Illinois Bell Telephone Link-Up II & Late Charge Litigation*, 2013 IL App (1st) 113349, ¶ 19. In the case at bar, the trial court expressly stated that it would afford little weight to Marcozzi's memorandum of her hours worked because it was "an estimate of time spent, created long after the work was performed." Accordingly, plaintiff also failed to properly establish damages, so the trial court properly found in favor of defendant on count V of the complaint.

¶ 49                                    III. Amendment of Complaint

¶ 50        As a final matter, plaintiff argues that it should have been permitted leave to file a second amended complaint. "A trial court decision to deny leave to file an amended complaint will not be disturbed absent a clear abuse of discretion." *Harding v. Amsted Industries, Inc.*, 276 Ill. App. 3d 483, 494 (1995). "A court abuses its discretion if allowing the amendment furthers the ends of justice." *W.E. Erickson Construction, Inc. v. Chicago Title Insurance Co.*, 266 Ill. App. 3d 905, 911 (1994).

¶ 51        " '[T]he factors which are to be considered in reviewing the propriety of the denial of a motion to amend the pleadings include (1) whether the proposed amendment would cure the defective pleading; (2) whether the proposed amendment would cause prejudice or surprise to the defendant; (3) the timeliness of the proposed amendment; and (4) whether previous opportunities to amend the pleadings could be identified.' " *Zubi v. Acceptance Indemnity Insurance Co.*, 323 Ill. App. 3d 28, 40 (2001) (quoting *Kennedy v. King*, 252 Ill. App. 3d 52, 55 (1993)); see also *Loyola Academy v. S&S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 273 (1992). "However, the primary consideration is whether amendment would further the ends of justice." *Regas v. Associated Radiologists, Ltd.*, 230 Ill. App. 3d 959, 968 (1992); see also *Cantrell v. Wendling*, 249 Ill. App. 3d 1093, 1095 (1993) ("The most important question is whether amendment will be in furtherance of justice, and amendment of defective pleadings should be permitted unless it is clear that the defect cannot be cured thereby. Any doubts should be resolved in favor of allowing amendments.").

¶ 52    In the case at bar, on July 28, 2016,[9] plaintiff sought to amend the complaint to add two additional counts concerning Marcozzi's work—one for unjust enrichment and one for *quantum meruit*. The motion for leave to file the second amended complaint did not provide any explanation as to why these counts had not been previously included in either the original complaint or the first amended complaint. The trial court denied the motion on August 8, 2016, and denied plaintiff's motion to reconsider on August 30, 2016. Trial began on September 12, 2016.

¶ 53    We cannot find that the trial court abused its discretion in denying leave to amend the complaint to add the two new causes of action. The proposed amendment was filed shortly before trial, after the parties had already been litigating the matter for nearly five years, and added two new causes of action. Plaintiff offered no explanation for why it was adding these counts so late in the process, especially since the facts underlying the causes of action were known to it from the inception of the lawsuit. Accordingly, we cannot find the denial of leave to amend to constitute an abuse of discretion.

¶ 54                                    CONCLUSION

¶ 55    For the reasons set forth above, we affirm the trial court's judgment that plaintiff was entitled to the producer commission but was not entitled to the marketer's fee. We further affirm the trial court's judgment that plaintiff failed to prove a breach of an oral contract concerning Marcozzi's work. Finally, we cannot find that the trial court abused its discretion in denying plaintiff's motion for leave to file a second amended complaint.

¶ 56    Affirmed.

---

[9]The copy of the motion for leave to file the second amended complaint contained in the record on appeal is not file-stamped. However, the parties do not dispute that plaintiff filed such a motion or its date.